v.

The STATE of Wyoming,
Appellee (Petitioner).

No. C–88–9.

Supreme Court of Wyoming.

March 20, 1989.

Robert G. Pickering of Bailey, Pickering, Stock & Welch, Cheyenne, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., for appellee.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

URBIGKIT, Justice.

Presented by this appeal is the difficult and socially pervasive concern of government responsibility—administrative, judicial and legislative—for the adequacy of care to be provided the mentally ill. Sufficiency of care and treatment was directly contested in the involuntary civil commitment of this admittedly mentally ill and severely disturbed adult to the Wyoming State Hospital (State Hospital) in Evanston, Wyoming, the state's only domiciliary institution. Consequently, alternative arrangements were requested, and the discretionary authority of the district court was questioned in this direct appeal of the involuntary commitment order as well as through a petition for extraordinary writ of prohibition. With the petition phrased in the contours of constitutional deprivation and functional denial, the writ was not granted at initial request. This court, with this combined appeal, affirms the district court's actions.

## FACTS

On March 22, 1988, an application for involuntary hospitalization was filed in the First Judicial District Court of Laramie County, Wyoming following a suicide attempt by K.C., an individual with a history of medical problems and prior institutionalization at the State Hospital. K.C., with this history, had been under the local supervision of the Department of Public Assistance and Social Services (D–PASS) as a person with a recognized mental disturbance. In Laramie County, commitment cases are initially handled by a designated court commissioner who immediately appoints a medical examiner and establishes a detention hearing with present counsel appointed to represent the individual. Collat-

erally involved in factual overlay was a pending divorce and the previous loss of custody of her two children.

Hospitalized by emergency detention ordered as a result of the commitment petition, a hearing was held on March 22, 1988, eventuating a continuing order for further examination with a designated medical examiner and hearing on March 28, 1988. It is from the March 28, 1988 hearing which produced the findings of the commissioner and subsequent order of the district court that this proceeding results. The commissioner found K.C. to be a mentally ill person within the criteria of W.S. 25–10–101(a)(viii)[1] and recommended hospitalization in finding "that the proposed patient is mentally ill and recommends that she be involuntarily hospitalized." The commissioner then further said:

> With regard to the appropriate location of the proposed patient's involuntary hospitalization, however, I do not feel that the Wyoming State Hospital is the appropriate site for involuntary hospitalization. Counsel for the proposed patient argued, and submitted a trial brief in support, that treatment at the Wyoming State Hospital would violate the proposed patient's right to treatment under the doctrine established in *Clark v. Cohen*, 794 F.2d 1979[79] Third Circuit (1988) and *Wyatt v. Stickney* [,] 325 Fed.Supp. 781, N.D.[M.D.]Ala. (1971). The proposed patient has previously been hospitalized, during April and May of 1987, at the Wyoming State Hospital. Her testimony at the hearing indicated that she did not receive treatment adequate, in the opinion of your Commissioner, to meet the constitutional right to treatment. Dr. Merrell testified that the proposed patient needs inpatient care for a period of at least six (6) months and perhaps as long as a year, depending upon the availability of programs transitional from the institution to the community. Dr. Merrell testified that to his knowledge, there are no community halfway house programs available in the State for psychiatric patients and that in his opinion, no hospital in Wyoming other than the State Hospital, is qualified to accept long-term patients (that is, patients whose condition requires a stay of greater than eight to ten weeks). Your Commissioner finds that counsel for the proposed patient has demonstrated a substantial likelihood that adequate treatment will not be received at the State Hospital and that other instate alternatives are not available.

Pursuant to the provisions of W.S. section 25–10–110(j),[2] consideration of the

---

1. W.S. 25–10–101(a)(viii) provides:

    "Mentally ill person" means a person who presents an imminent threat of physical harm to himself or others as a result of a physical, emotional, mental or behavioral disorder which grossly impairs his ability to function socially, vocationally or interpersonally and who needs treatment and who cannot comprehend the need for or purposes of treatment and with respect to whom the potential risk and benefits are such that a reasonable person would consent to treatment.

    This definition section of the commitment statute W.S. 25–10–101 has been rewritten by Wyo.Sess.Laws ch. 147 (1989), effective July 1, 1989. After that date, a designation of a mentally ill person is removed from the code to be replaced by W.S. 25–10–101(a)(ii), which states: "Dangerous to himself or others" means that, as a result of mental illness, a person:

    (A) Evidences a substantial probability of physical harm to himself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm; or

    (B) Evidences a substantial probability of physical harm to other individuals as mani-

fested by a recent overt homicidal act, attempt or threat or other violent act, attempt or threat which places others in reasonable fear of serious physical harm to them; or

    (C) Evidences behavior manifested by recent acts or omissions that, due to mental illness, he is unable to satisfy basic needs for nourishment, essential medical care, shelter or safety so that a substantial probability exists that death, serious physical injury, serious physical debilitation or serious physical disease will imminently ensue, unless the individual receives prompt and adequate treatment for this mental illness. No person, however, shall be deemed to be unable to satisfy his need for nourishment, essential medical care, shelter or safety if he is able to satisfy those needs with the supervision and assistance of others who are willing and available.

2. This section is also rephrased in 1989 enactment.

"least restrictive and most therapeutic alternatives" available for involuntary hospitalization and the proposed patient's right to treatment, for the reasons set out above, I cannot recommend that the proposed patient be hospitalized at the Wyoming State Hospital, unless enforceable assurances are made that the constitutionally requisite treatment will be received.

Therefore, it is your Commissioner's further recommendation that the Court enter an Order requiring the Department of Health and Social Services to locate and fund a placement either in or out of state which will satisfy the proposed patient's right to treatment or, in the alternative, that a plan of treatment be developed by the State Hospital which will meet the right to treatment standard as interpreted and enforced by the District Court. The Order is recommended to include a time limit of twenty (20) days within which to develop either alternative. [State's attorney] shall prepare the recommended Order.

Except as to the place of hospitalization, the recommendations of the commissioner for the involuntary hospitalization of K.C. were approved by order of the district court. The district court specifically rejected any alternative placement or search for alternative care and held "[t]hat the proposed patient be hospitalized and transported forthwith to the Wyoming State Hospital at or near Evanston, Wyoming." The district court's order further provided:

2. That, in conformity with W.S. § 25–10–113, the patient, within 15 days of admittance, shall be examined, the patient's record shall be reviewed and a plan of treatment for the patient shall be developed.

3. That, within 20 days of admittance, a copy of the Patient's plan of treatment shall be forwarded to this Court and an additional copy shall be forwarded to the patient's attorney, * * *.

With alternative medical care placement denied, K.C. initially pursued two courses of action. K.C. appealed the involuntary commitment order and simultaneously filed a petition with this court to secure a writ of prohibition denying placement of her at the State Hospital. This court declined to issue the writ of prohibition which would have resulted in the immediate delay of hospitalization at the State Hospital, and K.C. has been institutionalized at the State Hospital since mid-April; unless recently released, which is not a matter of record here.

This court will consider the direct appeal and the writ conjunctively as a single case now presented, essentially testing the propriety of the action of the district court in denying the finding of the commissioner that alternative mental institutional care should be required for this mentally ill person. K.C. phrases, as submitted questions:

1. Whether an involuntarily civilly committed individual is entitled to habilitation?

2. Whether the involuntary commitment statutes rise to the level of a state-created liberty interest in habilitation necessary to effect a right to live in the least restrictive, most therapeutic setting possible?

3. Whether an involuntarily civilly committed individual is entitled to either a constitutional or statutory right to treatment necessary to effectuate his/her right to live in the least restrictive, most therapeutic setting possible?

4. Whether it is a violation of procedural due process under both the federal and state constitutions, as well as, the involuntary commitment statutes, to transfer a patient to the Wyoming State Hospital without a pre-deprivation hearing concerning the proposed plan of treatment at that facility?

5. Whether it is a violation of procedural due process under both the federal and state constitutions, as well as the involuntary commitment statutes, to fail to hold a hearing on an objection to a post-deprivation proposed individual plan of treatment?

6. Whether a post-commitment individualized plan of treatment lacking an assessment of the patient's problems and

needs; the description of the services and treatment to be administered in the future and their possible side effects and feasible alternatives; the identity of specific individuals who will provide future services and treatment; the settings in which the services will be provided; a timetable for obtaining long-term goals or benefits from treatment or care; and a statement of the criteria for the patient's transition from the inpatient facility to a less restrictive, more therapeutic environment violates substantive due process under both the federal and state constitutions, as well as the involuntary commitment statutes?

Alternatively, the State responds with the following issues:

I. Does the appellate standard applied by this court to decisions of trial courts apply to district court "review" of actions of district court commissioners; has appellant shown that the decision of the district court was not supported by substantial evidence and was clearly erroneous?

II. Do the involuntarily civilly committed have a Fourteenth Amendment due process right to treatment in the least restrictive, most therapeutic environment?

III. Does Section 25–10–110(j) of the Wyoming statutes create an individual right to treatment in the least restrictive, most therapeutic environment for the involuntarily civilly committed?

IV. Did the court below err in committing K.C. to the Wyoming State Hospital?

V. Do the Wyoming statutes provide adequate procedural due process for a post-commitment review of the continuing need for hospitalization?

VI. Do the Wyoming statutes provide adequate procedural and substantive due process for a pre-commitment determination of the need for involuntary hospitalization?

VII. Has appellant shown a constitutional or statutory violation by the proposed individual treatment plan formulated in her case?

Initially, we point out that this appeal is confined to the issues presented which involve the validity of the commitment order and not subsequent status of care which might be tested by habeas corpus or further order of the district court, where continuing jurisdiction remains, to consider *whether the patient should remain in the State Hospital.* See *Tribby v. Cameron,* 379 F.2d 104 (D.C.Cir.1967); *Rouse v. Cameron,* 373 F.2d 451 (D.C.Cir.1966); National Center for State Courts, Guidelines for Involuntary Civil Commitment 86 (1986); 2 A. Freedman, H. Kaplan, & B. Sadock, Comprehensive Textbook of Psychiatry–II § 50.1 at 2429 (2d ed.1975); and 3 B. Ennis & P. Friedman, Legal Rights of the Mentally Handicapped 1153 (1973). Secondly, there is no dispute, issue, or absence of evidence but that involuntary commitment and hospitalization were both appropriate and required for K.C. The dispute centers on the place of care for K.C. Fundamental in concept and concern in this anguished case is the belief, not only of the counsel for K.C. but also the court commissioner, that the State Hospital, where prior hospitalization had occurred, was not adequate to provide treatment for K.C.

## DISCUSSION

We surmise from the carefully prepared and extended briefing of counsel as mutually evidenced that two intrinsic dispositive issues are presented by these combined proceedings:

(1) Relationship of the district court to the court commissioner in ultimate authority and decision; and

(2) Power or requirement of the district court to commit the mentally ill to a habilitation institution outside of the state in the face of evidence that the State Hospital may fail in sufficiency of either capacity or performance in curative hospitalization for K.C.

1. *Relationship of the district judge to the court commissioner.*

■ The designated court commissioner,

under W.S. 25–10–110(k)[3] and Wyo. Const. art. 5, § 14,[4] has no more extended function than initial fact finding and entry of preliminary orders. The recommendations —conclusions based upon fact as well as law which are distilled into judgment orders—cannot be blindly accepted by the district court. The district court cannot delegate the power to hear, try, or determine a case to a court commissioner. *Foster v. Foster*, 768 P.2d 1038 (Wyo.1989); *Huhn v. Quinn*, 21 Wyo. 51, 128 P. 514 (1912).

This court recently discussed in *Foster*, 768 P.2d 1038 the court commissioner's role in relation to domestic relations matters. This court found that the district court's cursory review and acceptance of the court commissioner's findings leading to an increase in child support which was substantiated only by the district court's reading and signing of the prepared order were insufficient. *Id.* at 1042.

> [W]e do perceive that the Wyoming Constitution and applicable statutes contemplate that the district court shall conduct an independent review of the court commissioner's actions beyond that afforded in this case. The court commissioner may take evidence, make findings, and submit a recommendation to the district court. *The district court, however, must review the evidence and findings and make its decision upon the basis of that review.*

*Id.* at 1041 (emphasis added). This court further elucidated that the record should clearly indicate that the district court *independently* reviewed the evidence and findings to reach its informed decision. *Id.* at 1041. In the instant case, the district court's rejection of the alternative placement recommendation and imposition of the state hospitalization plan shows that the required independent review of the case was undertaken. Simply put, "[g]eneral court commissioner responsibilities as a hearing examiner cannot be outspread, absent expansion of constitutional authorization, to include power of decisional finality within present constitutional terms. The differentiation is between adjunct fact finding and plenary judicial responsibility." *Id.* at 1042, Urbigkit, J., specially concurring. See also *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

While the sociologically well-founded intent of the commissioner and the medical examiner[5] concerning the sufficiency of the state institution may be well-founded, it is not determinative and binding upon the district court in its exercise of application of state statutes and funding opportunities to its decision. Consequently, the real issue does not encompass an abuse of discretion analysis for the district court to disregard part of the commissioner's recommendation as it did, but rather a sufficiency of fact to sustain the district court's exercise of discretion in institutional selec-

---

3. W.S. 25–10–110(k) provides:

   The court is authorized to appoint a special commissioner to assist in the conduct of hospitalization proceedings. In proceedings under this act [§§ 25–10–101 through 25–10–305], regularly appointed court commissioners may exercise the authority granted by W.S. 5–3–307. In any case in which the court refers an application to the commissioner, the commissioner shall conduct the involuntary hospitalization proceedings under this section and on the basis thereof shall either recommend dismissal of the application or hold a hearing as provided in this section and make recommendations to the court regarding the hospitalization of the proposed patient.

4. Wyo. Const. art. 5, § 14 provides:

   The legislature shall provide by law for the appointment by the several district courts of one or more district court commissioners (who shall be persons learned in the law) in each organized county in which a district court is holden, such commissioners shall have authority to perform such chamber business in the absence of the district judge from the county or upon his written statement filed with the papers, that it is improper for him to act, as may be prescribed by law, to take depositions and perform such other duties, and receive such compensation as shall be prescribed by law.

5. We must be aware of the dangers which lie in our most generous wishes. Some paradox of our nature leads us, when once we have made our fellow men the objects of our enlightened interests, to go on to make them the object of our pity, then of our wisdom, ultimately of our coercion.

   J. Robitscher, The Powers of Psychiatry 1 (1980) (quoting L. Trilling, The Liberal Imagination).

tion. It is to that subject that we next address attention.

2. *The power of the district court to commit mentally ill persons outside this state.*

The statutory involuntary commitment process,[6] as invoked by application of W.S. 25–10–110, has provisions for emergency detention, W.S. 25–10–109; preliminary hearing, W.S. 25–10–109(h); and general commitment hearing, W.S. 25–10–110(f). In addition to dismissal, disposition options statutorily available in W.S. 25–10–110(j) to the district judge include:

(i) Order his hospitalization;

(ii) Assign him to a hospital;

(iii) Send to the hospital, with the patient a certified copy of the findings of fact and order and a copy of the examiner's report;

(iv) Specify where he will be detained pending transportation to the hospital. Only during an extreme emergency shall a person be detained in a nonmedical facility used for detention of persons charged with or convicted of penal offenses.

As defined in W.S. 25–10–101(a)(v), " 'Hospital' means a facility designated pursuant to W.S. 25–10–104 or the state hospital;" with further definition of "State Hospital" afforded in W.S. 25–10–101(a)(xi) which "means the Wyoming state hospital at Evanston, Wyoming." W.S. 25–10–104 outlines D–PASS's duties to hospitals other than the State Hospital.[7] At present, Wyoming has no psychiatric halfway houses, and there is no other domiciliary care facility approved in accord with W.S. 25–10–104.

The county is responsible for initial detention and maintenance expenses, W.S. 25–10–112, with hospitalization financial responsibility thereafter assigned to either the State Board of Charities and Reform for care provided in the State Hospital or D–PASS if care is provided elsewhere. It is in this source of responsibility for providing medical care and the availability and expense of costs to be required that the practical legislative-administrative agency responsibilities become entangled. Realistically, the difference between the district court and the commissioner in this case was whether the more conservative budgetary approach was justified, appropriate or permitted. Clearly, nothing statutorily stated confines the district court to accept the out-of-state institution alternative with the probable singularly higher cost involvement. The real issue, lacking mandatory statute, is whether the state constitution, the Fourteenth Amendment to the United States Constitution, or other federally preemptive criteria require the district court to provide a standard of care allegedly not available within the State Hospital.[8]

■ Essentially, K.C. is advocating that

---

**6.** See 1 P. Friedman, Legal Rights of Mentally Disabled Persons 235 (1979) for an overview of other states' laws on civil commitment and Stromberg & Stone, *Statute–A Model State Law on Civil Commitment of the Mentally Ill*, 20 Harv.J. on Legis. 275 (1983).

**7.** W.S. 25–10–104 provides:

(a) The department, with respect to hospitals other than the state hospital, shall:

(i) Adopt standards for the designation of hospitals as qualified to provide treatment under this act [§§ 25–10–101 through 25–10–305];

(ii) Designate hospitals which qualify under the standards adopted pursuant to paragraph (i) of this subsection;

(iii) Enter into cooperative contracts with hospitals for the treatment of mentally ill persons and other services incident to the hospitalization of patients;

(iv) Require reports from hospitals concerning the services rendered to patients under the provisions of this act;

(v) Visit each hospital at least once a year to review methods of treatment for all mentally ill patients; and

(vi) Investigate complaints made by or on behalf of mentally ill patients.

This section is restated in the 1989 enactment without substantive change.

**8.** The record does not reflect what the relative cost factors might be nor the comparison of degree of care that might be obtained. Essentially, the prior hospitalization at the State Hospital seems to have been minimally beneficial and a further effort in that direction was not considered by the medical examiner to be justified.

she is denied her right to treatment[9] because she is not receiving the best treatment for her illness since she is not being treated in a psychiatric halfway house.[10] We disagree with K.C.'s broad characterization of the right to treatment and her implications. Even Judge Bazelon in *Rouse*, 373 F.2d at 456–57, while first enunciating such a right, recognized the limits of it:

> The hospital need *not* show that the treatment will cure or improve him but only that there is a *bona fide* effort to do so. This requires the hospital to show that initial and periodic inquiries are made into the needs and conditions of the patient with a view to providing suitable treatment for him, and that the program provided is suited to his particular needs. * * *
>
> The effort should be to provide treatment which is adequate in light of present knowledge. * * * [T]he possibil-

ity of better treatment does *not* necessarily prove that the one provided is unsuitable or inadequate. [Emphasis added & footnotes omitted.]

The Circuit Court of Appeals for the District of Columbia further clarified and honed this right in *Tribby*, 379 F.2d at 105:

> We do *not* suggest that the court should or can decide what particular treatment this patient requires. The court's function here resembles ours when we review agency action. We do not decide whether the agency has made the *best* decision, *but only make sure that it has made a permissible and reasonable decision in view of the relevant information and within a broad range of discretion.* [Emphasis added.]

Consequently, our review of the dilemma faced by the district court in placement decision[11] centers simply on whether the

9. The "right to treatment" is initially credited to Dr. Morton Birnbaum, both a physician and attorney, who, in 1960, first defined the concept in Birnbaum, *The Right to Treatment*, 46 A.B.A. J. 499 (1960). See J. Robitscher, supra n. 5, at 103; A. Brooks, Law, Psychiatry and the Mental Health System 870 (1974); 1 B. Ennis and P. Friedman, Legal Rights of the Mentally Handicapped 275 (1973); and 1 L. Irvine & T. Brelje, Law, Psychiatry and the Mentally Disordered Offender 51 (1972). For historical perspectives on the evolution of this right, see: Robitscher, *The Right to Psychiatric Treatment: A Social–Legal Approach to the Plight of the State Hospital Patient*, 18 Vill.L.Rev. 11 (1972); 1 B. Ennis & P. Friedman, supra n. 9, at 275; S. Brakel & R. Rock, The Mentally Disabled and the Law 34 (1971); and R. Allen, E. Ferster, & H. Weihofen, Mental Impairment and Legal Incompetency 2 (1968).

The rubric "right to treatment" is somewhat misleading in that it suggests that there is such a right explicitly recognized in the Constitution. In fact, the right to treatment is a shorthand way of describing that package of rights which the involuntarily confined mental patient is guaranteed by the due process and equal protection clauses, and the cruel and unusual punishment prohibition. In some states, there is also an explicit statutory recognition of a right to treatment which may also serve as a basis for suit.

1 B. Ennis & P. Friedman, supra, at 280.

10. It is unfortunate that many, including K.C., try to link the right to treatment to the physical placement of the care forgetting about the other intangible ingredients in successful therapy.

Optimal patient-staff ratios, access to a wide variety of therapeutic modalities, and establishment of a human environment, all of which are sorely lacking in most institutions for the mentally ill, are prerequisites for treatment which society can provide. They must *not* be equated with the therapeutic endeavor itself. The right to treatment, if it is to have meaning, requires in addition a person who can exercise such a right or if treatment is imposed, can benefit from it. * * * Yet, in linking the right to treatment with adequate staff and a "bona fide effort" to treat, there is the danger that once such conditions are met and proof to that effect is submitted, the right to treatment will be construed to rest on *the existence of facilities* and not on the person's willingness or ability to utilize them.

G. Morris, The Mentally Ill and The Right to Treatment 13–14 (1970) (footnotes omitted and emphasis added).

11. We are cognizant that a case of this kind intertwines and requires a balance of serious constitutional, legislative, and budgetary problems. See *Nason v. Superintendent of Bridgewater State Hospital*, 353 Mass. 604, 233 N.E.2d 908, 913 (1968). The issues presented here have a stark similarity to the concerns for education of the handicapped addressed by this court in *Natrona County School Dist. No. 1 v. Ryan*, 764 P.2d 1019 (Wyo.1988); *Natrona County School Dist. No. 1 v. McKnight*, 764 P.2d 1039 (Wyo. 1988); and by the United States Supreme Court in *Board of Educ. of Hendrick Hudson Central School Dist. Bd. of Ed., Westchester County v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) and *Pennhurst State School and Hos-*

district court abused its discretion by disregarding either statutory or constitutional law in not requiring a more preferable level of care. We find no abuse of the district court's discretion in choosing placement at the State Hospital.

This resolution is confined to our statutory system as provided by our legislature. As Dr. Birnbaum has astutely recognized:

[T]he state legislature rather than the judiciary, seems the proper instrumentality to take the lead in establishing and enforcing a right to adequate treatment. Only the legislature has the means to set up a comprehensive scheme and to coordinate it with necessary legislative appropriations; the judiciary is limited to a case-by-case development.

Birnbaum, *A Rationale for the Right*, 57 Geo.L.J. 752, 765 (1969). See also Bazelon, *Implementing the Right to Treatment*, 36 U. of Chi.L.Rev. 742, 745 (1969).

With neither the Wyoming Constitution nor the United States Constitution mandating a greater degree of care than what the legislative branch has funded and the executive branch has provided through facilities within this state, we find no abuse of discretion in the district court's placement of K.C. at the State Hospital.

Affirmed.

*pital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).