Margaret HOLM, Plaintiff and Appellant,

v.

Michael SMILOWITZ, Defendant and Appellee.

No. 910594–CA.

Court of Appeals of Utah.

Sept. 25, 1992.

Hans Q. Chamberlain, Chamberlain & Higbee, Cedar City, Ellen Maycock (argued), Steven G. Loosle, Kruse, Landa & Maycock, Salt Lake City, for plaintiff and appellant.

Keith F. Oehler (argued), Keith F. Oehler, J.D., P.C., Cedar City, for appellee.

Before BILLINGS, ORME and RUSSON, JJ.

## OPINION

RUSSON, Judge:

Margaret Holm appeals the district court's denial of her motion for relief from judgment, filed pursuant to Rule 60(b) of the Utah Rules of Civil Procedure. We reverse and remand.

## FACTS

Michael Smilowitz and Margaret Holm were divorced in Ohio on July 27, 1989. Holm was awarded custody of the parties' sixteen month-old daughter. The following year, Holm filed a motion to modify the visitation provisions of the divorce decree, and Smilowitz filed a motion to change custody. Smilowitz moved to North Carolina, and Holm, with the parties' child, moved to Utah. On June 21, 1991, both parties attended a hearing on their pending motions in Ohio. At that hearing, the Ohio court discovered procedural defects in the parties' motions, namely that neither party had properly served the other, and ordered the parties to refile their motions. They were informed that they would receive written notice of the new hearing date, set

for August 19. On June 27, Smilowitz refiled his petition, but did not serve Holm with the same until August 21. Holm never received written notice of the new hearing date from the Ohio court.

Meanwhile, on July 8, 1991, Holm filed the Ohio divorce decree in Utah, pursuant to the Utah Foreign Judgment Act, along with a motion for Utah to assume jurisdiction under the Uniform Child Custody Jurisdiction Act (UCCJA) and a petition to modify the divorce decree as to visitation. She contended that Utah had "significant connections with" and was now the child's "home state" under that act. On August 8, Holm's motion was heard by Domestic Relations Commissioner Marlynn Lema, who took the matter under advisement.

A deposition, which had been scheduled in Ohio in early August 1991, was cancelled because Holm had not yet been served with Smilowitz's latest petition. According to Holm's affidavit, Smilowitz's attorney then informed Holm's Ohio attorney that since Holm had not been served, the August hearing would not proceed as scheduled. On August 14, 1991, Holm's Utah attorney wrote a letter to the Ohio court, in which he informed the court that (1) Holm presently had a pending motion for Utah to assume jurisdiction pursuant to the "best interests" and "home state" provisions of the UCCJA, (2) Ohio was an "inconvenient forum" under the UCCJA since neither party nor the child resided there, (3) the same procedural problems that caused the June 21 hearing to be postponed still existed, and (4) Holm would not appear in Ohio until she had been properly served with Smilowitz's new petition and received notice from the court that the hearing would proceed as scheduled. On August 19, 1991, in spite of Holm's absence, the Ohio court held the hearing, ruled that it had jurisdiction, awarded Smilowitz custody of the parties' child, and issued an order to that effect.

On August 22, 1991, Smilowitz, accompanied by the Cedar City, Utah police, arrived at Holm's Utah residence with the recently issued Ohio order and demanded that he be given the child pursuant to the Ohio order. This Ohio order had not been domesticated in Utah. Holm contacted her Utah attorney, Hans Chamberlain, who told the police to see either Judge Eves, in whose court Holm had filed her motions, or his commissioner, Marlynn Lema. The police informed Chamberlain that the matter would be heard by Judge Eves the next morning. However, later that evening, Commissioner Lema called Chamberlain and informed him that she was denying Holm's motion for Utah to assume jurisdiction. Chamberlain requested a hearing from her on the Ohio order. The request was denied. Commissioner Lema then called a second time that evening and informed Chamberlain that she had talked to Judge Eves, and based on their conversation, it was her order that the Ohio order be enforced that very night. She then called the police, and without ever having seen the Ohio order, or the order ever having been filed in Utah, told them to enforce it. At 11:40 p.m., the police physically removed the child, screaming and vomiting, from her mother, and Smilowitz left the state with the child, now three and a half years old.

Holm subsequently filed a motion for relief on the grounds that (1) Smilowitz had never domesticated the Ohio order in Utah, and (2) Holm was denied her right to contest the jurisdiction of the Ohio court. At a hearing held on September 4, 1991, Judge Eves stated that he had only told Lema that he agreed with her as to Utah's lack of jurisdiction, and that since Utah did not have jurisdiction, he couldn't interfere with the Ohio order.[1] On September 8, Judge

---

1. Specifically, the conversation proceeded as follows:

MR. CHAMBERLAIN: [Commissioner Lema] just told me that we were not going to have a hearing. What she said—she told me—she said, "I will call Judge Eves and see what his opinion is of this." She—she then called me back and said she had talked to you, and said

that you had told her to go ahead and have the order enforced that night and to call the police officers—
THE COURT: Let me disabuse you of that. She called me; told me that she was going to deny jurisdiction in the matter; that she'd already spoken with the judge back in Ohio; that they had continuing and original jurisdic-

Eves, by written order, denied Holm's motion for relief, holding that: (1) Ohio had original and continuing jurisdiction; (2) Utah declined jurisdiction after consultation with the Ohio court; (3) since the Ohio order was never filed in Utah, there was no order from which Holm was entitled to relief; and (4) Utah had no jurisdiction to enforce or prevent enforcement of the Ohio order.

Holm appeals the Utah district court's order denying her motion for relief from the Utah order enforcing the undomesticated Ohio child custody order. This appeal concerns the following errors by the district court: (1) concluding that it did not have jurisdiction in this matter; (2) enforcing the Ohio change of custody order that had not been filed in Utah, instead of the original Ohio divorce decree which had been so filed; (3) refusing Holm a hearing before enforcing the Ohio change of custody order; and (4) permitting Commissioner Lema to perform non-delegable judicial acts. Smilowitz seeks sanctions for a frivolous appeal.

## ANALYSIS

### Standard of Review

■ As a general rule, we will only reverse a denial of a motion to vacate an order or judgment under Rule 60(b) upon a showing of abuse of discretion by the trial court. *State v. Vijil,* 784 P.2d 1130, 1132 (Utah 1989). However, when the denial of such a motion rests on an underlying jurisdictional determination, as it does here, it "becomes a question of law upon which we do not defer to the district court." *Id.*

### Jurisdiction under the UCCJA

■ As an initial matter, we address the district court's erroneous conclusion that it did not have jurisdiction in this case. The UCCJA, which has now been adopted in all fifty states and the District of Columbia,

specifically recognizes that two states may have simultaneous concurrent jurisdiction, but only one state may *exercise* it. The purpose of the act, codified in Utah at Utah Code Ann. §§ 78–45c–1 to –26 (1992), is to direct when such jurisdiction shall be exercised. Utah Code Ann. § 78–45c–3 (1992) states:

(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if the conditions as set forth in any of the following paragraphs are met:

(a) this state:

(i) is the home state of the child at the time of commencement of the proceeding; or

(ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state;

(b) it is in the best interest of the child that a court of this state assume jurisdiction because:

(i) the child and his parents, or the child and at least one contestant, have a significant connection with this state; and

(ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

(c) the child is physically present in this state or this state is the most recent domicile of the mother prior to the birth of the child, and:

(i) the child has been abandoned; or

(ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with

---

tion. They wanted to maintain that. That under the Uniform Child Custody Act, she did not feel Utah could take jurisdiction of the matter. As she explained the facts to me, I concurred that we could not take jurisdiction. That was the extent of the conversation. That we had no jurisdiction in the matter so long as Ohio intended to continue with their jurisdiction, and that the matter should be handled in Ohio. And that was the extent of our conversation.

mistreatment or abuse or is otherwise neglected or dependent; or

(d) (i) it appears that no other state would have jurisdiction under prerequisites substantially in accordance with Subsections (a), (b), or (c), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child; and

(ii) it is in the best interest of the child that this court assume jurisdiction.

Thus, State Two clearly has jurisdiction if it meets one of the bases established in that section, regardless of the fact that another state may also have jurisdiction.

Other sections of the UCCJA also indicate concurrent jurisdiction wherein they require that State Two *shall stay proceedings* if the matter is pending in another state, Utah Code Ann. § 78–45c–6(3) (1992); or *may decline to exercise its jurisdiction* if the first state is a more appropriate forum, Utah Code Ann. § 78–45c–7 (1992); or *may decline to exercise its jurisdiction* if the petitioner is guilty of improper conduct, Utah Code Ann. § 78–45c–8(1) (1992); and *shall not exercise its jurisdiction* to modify unless the interest of the child necessitates, Utah Code Ann. § 78–45c–8(2) (1992).

Utah case law also illustrates the existence of concurrent jurisdiction. In *Coppedge v. Harding*, 714 P.2d 1121 (Utah 1985), an action was filed by the Coppedges in Oregon, to make them guardians of their grandson, who was living with them in Oregon. In response, a custody action by the child's parents was subsequently filed in Utah. The Utah Supreme Court ordered the Utah district court "to *stay* the Utah action to the extent that it seeks to determine custody under the Uniform Act" and "to communicate with the Oregon Court ... to determine the propriety of further proceedings in Oregon." *Id.* at 1122. The supreme court further instructed the district court that "[i]n the event that the

Oregon court stays its proceedings after such communication, then the Utah court may proceed to adjudicate the custody matter." *Id.* If the Utah district court did not have jurisdiction, it would not have the power to *stay* its proceedings, nor the power to *proceed* after communicating with Oregon. On the other hand, if Oregon did not have jurisdiction, the Utah Supreme Court would have simply concluded such and ordered the district court to proceed. Therefore, it is clear that both states had jurisdiction. *See also State in Interest of W.D. v. Drake*, 770 P.2d 1011, 1013 (Utah App.1989) (under the facts of that case, Utah and California had concurrent jurisdiction); *Rawlings v. Weiner*, 752 P.2d 1327, 1331 (Utah App.) (Bench, J., concurring) (under the facts of that case, Utah had primary jurisdiction and Washington had secondary jurisdiction), *cert. denied*, 765 P.2d 1278 (Utah 1988).

Under the UCCJA and relevant case law, concurrent jurisdiction exists whenever a state satisfies one of the circumstances enumerated in Utah Code Ann. § 78–45c–3 (1992). In the case at bar, Utah has jurisdiction since it is in the best interest of the child for Utah to assume jurisdiction because the child and at least one parent have a significant connection with Utah and there is substantive evidence in Utah pertaining to the child's care, protection, training and personal relationships. *See* Utah Code Ann. § 78–45c–3(1)(b) (1992). Accordingly, the district court erred when it concluded that it did not have jurisdiction in this matter.[2]

However, just because the Utah court has jurisdiction does not mean that it can *exercise* it. Once the jurisdictional requirements of the UCCJA have been met, Utah Code Ann. §§ 78–45c–6, –7, and –14 (1992) must be examined to determine whether such jurisdiction can be exercised. Under section 14, State Two generally cannot modify the custody decree of State One *unless* it appears to the court of State Two that State One "does not now have jurisdic-

---

**2.** Moreover, if the district court and its commissioner were correct in concluding that Utah did not have jurisdiction, then it follows that not

only did Utah lack jurisdiction to prevent the execution of the Ohio order, but it also lacked jurisdiction to enforce it.

tion under jurisdictional prerequisites substantially in accordance with [the UCCJA] or has declined to assume jurisdiction[.]" Utah Code Ann. § 78–45c–14(1)(a) (1992). Accordingly, if both parents and the children move from the state of the original decree, deference to that state's jurisdiction is no longer required. *State in Interest of D.S.K.*, 792 P.2d 118, 124 (Utah App. 1990) (citing Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction under the UCCJA*, 14 Fam.L.Q. 203, 214–15 (1981)). The operation of section 14 was explained by the drafters of the UCCJA, the National Conference of Commissioners on Uniform State Laws, as follows:

> Courts which render a custody decree normally retain continuing jurisdiction to modify the decree under local law. Courts in other states have in the past often assumed jurisdiction to modify the out-of-state decree themselves without regard to the preexisting jurisdiction of the other state. See *People ex rel. Halvey v. Halvey*, 330 U.S. 610, 67 S.Ct. 903[, 91 L.Ed. 1133] (1947). In order to achieve greater stability of custody arrangements and avoid forum shopping, subsection (a) declares that other states will defer to the continuing jurisdiction of the court of another state as long as that state has jurisdiction under the standards of the Act. In other words, all petitions for modification are to be addressed to the prior state if that state has sufficient contact with the case to satisfy section 3. The fact that the court had previously considered the case may be one factor favoring its continued jurisdiction. If, however, all the persons involved have moved away or the contact with the state has otherwise become slight, modification jurisdiction would shift elsewhere. Compare Ratner, *Child Custody in a Federal System*, 62 Mich. L.Rev. 795, 821–22 (1964).
>
> For example, if custody was awarded to the father in state 1 where he continued to live with the children for two years and thereafter his wife kept the children in state 2 for 6½ months (3½ months beyond her visitation privileges)

with or without permission of the husband, state 1 has preferred jurisdiction to modify the decree despite the fact that state 2 has in the meantime become the "home state" of the child. If, however, the father also moved away from state 1, that state loses modification jurisdiction interstate, whether or not its jurisdiction continues under local law. See Clark, *Domestic Relations* 322–23 (1968).

Uniform Child Custody Jurisdiction Act, Comment at 32 (1968) (hereinafter, Comment). Thus, in the case at bar, the district court had the duty to examine whether deference to Ohio was still required under the UCCJA.

Additionally, Utah Code Ann. § 78–45c–6 (1992) provides that State Two "shall not exercise its jurisdiction ... if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction[.]" Utah Code Ann. § 78–45c–6(1) (1992). In such case, State Two "shall stay the proceeding and communicate with the court in which the other proceeding is pending to the end that the issue may be litigated in the more appropriate forum[.]" Utah Code Ann. § 78–45c–6(3) (1992). This is the option that the commissioner and the Utah district court apparently attempted to pursue here. However, rather than stay the action, the commissioner instead dismissed it outright, in contravention of section 78–45c–6(3).

Given that the purposes of the UCCJA include determination of custody by the state which can best decide the case in the interest of the child, facilitating the enforcement of custody decrees of sister states, and promotion of cooperation and mutual assistance between states, *see* Utah Code Ann. § 78–45c–1 (1992), the Utah district court, at the very least, should have stayed its determination until after it held a hearing to determine whether jurisdiction should be exercised. We therefore conclude that the district court not only erred in determining that it had no jurisdiction, but also erred in refusing to hold a hearing to examine whether jurisdiction should be exercised.

**Enforcement of Ohio Modification Order**

■ The commissioner and the district court further erred in enforcing the Ohio order. Although it is clear that under the United States Constitution, another state's orders are entitled to full faith and credit in Utah, *see* U.S. Const. art. IV, § 1, it is equally clear that a foreign judgment must first be filed in Utah in order for it to become an enforceable Utah order, and furthermore, that the parties are, in most circumstances, entitled to a hearing on the foreign order to examine the narrow issue of whether the other state court had jurisdiction when it rendered its order. Neither occurred here, resulting in denial of Holm's substantive due process rights.

Smilowitz argues that since Utah Code Ann. § 78–45c–15 (1992) only provides that a certified copy of a custody decree *may* be filed with a district court clerk in Utah, the Utah Foreign Judgment Act does not apply to the decree here. We disagree. The National Conference of Commissioners on Uniform State Laws explained section 15 of the UCCJA as follows:

> Out-of-state custody decrees which are required to be recognized are enforced by other states. See section 13 [Utah Code Ann. § 78–45c–13 (1992)]. Subsection (a) [Utah Code Ann. § 78–45c–15(1) (1992)] provides a simplified and speedy method of enforcement. It is derived from section 2 of the Uniform Enforcement of Foreign Judgments Act of 1964, 9A U.L.A. 486 (1965).

Comment at 33. Section 2 of the Uniform Enforcement of Foreign Judgments Act of 1964 is substantially similar to the Utah Foreign Judgment Act. Thus, enforcement of a foreign custody decree pursuant to the UCCJA must be accomplished in compliance with provisions of the Utah Foreign Judgment Act, which governs the procedure for enforcement of all foreign judgments. *See, generally, Beck v. Smith,* 296 N.W.2d 886, 891 (N.D.1980). This ruling is consistent with other states that have held that under the UCCJA, a certified copy of the foreign judgment must first be filed in the state before the state will recognize and enforce it. *See, e.g., In re Marriage of Dagan,* 103 Or.App. 453, 798 P.2d 253, 255 (1990). Otherwise, nothing could prevent one divorced parent from suddenly appearing on the former spouse's doorstep with a foreign order in hand, demanding immediate change of custody without the custodial parent having an opportunity to be heard, or the foreign order tested for validity. An order of a judge in one state is simply not enforceable in another state until that order has been domesticated in the second state.

Article IV, Section 1 of the United States Constitution provides: "Full Faith and Credit shall be given in each state to the Public Acts, Records, and Judicial Proceedings of every other State." Created as a mechanism for enforcing this section, the Utah Foreign Judgment Act, defines a "foreign judgment" as "any judgment, decree, or order of a court of the United States or of any other court whose acts are entitled to full faith and credit in this state." Utah Code Ann. § 78–22a–2(1) (1992). However, before the said judgment can be enforced in Utah, a party must first file it with a clerk of any district court. *See* Utah Code Ann. § 78–22a–2(2) (1992).[3] After such occurs, "[t]he clerk of the district court shall treat the foreign judgment in all respects as a judgment of a district

---

**3.** The specific language of Utah Code Ann. § 78–22a–2(2) (1992) reads: "A copy of a foreign judgment authenticated in accordance with an appropriate act of Congress or an appropriate act of Utah *may* be filed with the clerk of any district court in Utah." Smilowitz argues that the use of "may" suggests that the method undertaken here, simply taking the foreign judgment straight to the police, is also an acceptable alternative. We disagree. The Utah Supreme Court explained the history of the Utah Foreign Judgment Act in *Pan Energy v. Martin,* 813 P.2d 1142, 1143 (Utah 1991), and noted that its purpose was "to simplify the enforcement of foreign judgments by sparing the judgment holder the burden of further litigation and allowing enforcement in this state by the simple expedient of filing the judgment with a county clerk in Utah. The judgment holder still has the option, however, to commence an enforcement action under the older, traditional approach." *Id.* (citation omitted). Thus, use of the word "may" merely conveys that the judgment holder may file it with a district court clerk or use the prior approach, not that he may proceed without docketing the judgment whatsoever.

court of Utah." *Id.* The Utah Supreme Court has stated that the purpose of this statute is to enable "foreign judgments to be treated as if they were local judgments *once they have been filed with the clerk of a district court." Pan Energy v. Martin,* 813 P.2d 1142, 1144 (Utah 1991) (emphasis added).

Thus, under section 78–22a–2, both the original divorce decree that gave custody to Holm, and the Ohio order that changed custody to Smilowitz are foreign judgments. However, only the original divorce decree was enforceable in Utah since only it had been filed here.

Thus, the Utah district court erred in enforcing the undomesticated Ohio order when it, in fact, was obligated to enforce the only document legally before it, the original Ohio divorce decree, which granted custody of the child to Holm.

### Holm's Due Process Rights

■ Holm argues that the commissioner and the district court violated her due process rights by refusing her Utah attorney's request for a hearing on the undomesticated Ohio order. We agree.

"The demands of due process rest on the concept of basic fairness of procedure and demand a procedure appropriate to the case and just to the parties involved." *Wiscombe v. Wiscombe,* 744 P.2d 1024, 1025 (Utah App.1987) (quoting *Rupp v. Grantsville City,* 610 P.2d 338, 341 (Utah 1980)). "One of the fundamental requisites of due process is the opportunity to be fully heard." *Id.* (citation omitted).

■ While the district court may have eventually declined to exercise jurisdiction under Utah Code Ann. § 78–45c–6 (1992), it was error to do so without permitting Holm a hearing as to Ohio's jurisdiction in regard to its order changing custody. It is well settled that "[a] foreign judgment rendered without jurisdiction over the defendant or under circumstances which amount to a lack of due process is not entitled to full faith and credit in Utah." *Data Management Sys., Inc. v. EDP Corp.,* 709 P.2d 377, 379 (Utah 1985); *see also Paffel v. Paffel,* 732 P.2d 96, 99 (Utah 1986) (a for-

eign judgment entered without jurisdiction and proper service of process is void and need not be accorded full faith and credit). Only when the question of a sister state's jurisdiction is fully and fairly litigated in the foreign court, does such judgment have a res judicata effect on the matter of jurisdiction in Utah. *See Data Management Sys., Inc.,* 709 P.2d at 379; *Paffel,* 732 P.2d at 99.

In a case similar to ours, *Wyatt v. Falhsing,* 396 So.2d 1069 (Ala.Civ.App. 1981), the Alabama Court of Civil Appeals held that the mother, who was living in Alabama, was denied her due process rights by the trial court's enforcement of a foreign modification judgment without giving the mother reasonable notice and opportunity to be heard. The court stated:

A prompt hearing should be held as to whether the [UCCJA] requires that the sister state's custody judgment be recognized and enforced. The party seeking to enforce the judgment of another state normally would meet their initial burden of proof at that limited hearing by the introduction into evidence of a properly authenticated copy of the judgment relied upon. At such hearing, the parent contesting the foreign judgment would have the right to specifically plead in defense thereto and to present evidence as to the nonexistence of the jurisdiction of the sister state rendering the judgment. They could also plead and prove whether other just cause exists under the Act for not recognizing the judgment such as those stated in Section 8 [Utah Code Ann. § 78–45c–8 (1992) ]; or whether the sister state's judgment was punitive; or whether there was a lack of notice of the sister state's proceedings as is required by Section 4 [Utah Code Ann. § 78–45c–4 (1992) ]. The above examples are not intended to be exclusive, for there may be other valid grounds of contest at that first hearing.

... Should the trial court determine after such hearing that such a judgment must be recognized, the court would then enforce the other state's judgment without further proceedings.

If the local court decides that the Act does not authorize the recognition of the judgment, and if modification proceedings are then pending in the trial court, a further or additional hearing would be held to determine whether, in the trial court's judicial discretion, jurisdiction over such modification proceedings should then be exercised.

*Id.* at 1073 (citations omitted). The Alabama court concluded that due to the lack of a hearing satisfying the requirements above, the wife's due process rights were violated.

In the same way, Holm's due process rights were violated by the commissioner's decision to enforce the Ohio change of custody order without granting Holm the hearing that her attorney timely requested. In the case at bar, Holm received no notice from the Ohio court as to the hearing scheduled for August 19. Secondly, Holm was not served with Smilowitz's motion until August 21, two days *after* the hearing was held in Ohio. Thirdly, based on these procedural defects, which had already led to the postponement of the June 21 hearing, Holm's Utah attorney informed the Ohio court that Holm would not appear in Ohio until the same were remedied, which letter received no response. Fourthly, Smilowitz's Ohio counsel informed Holm's Ohio counsel that the August hearing would not proceed as planned. Under such circumstances, there was a valid issue whether the modification order was jurisdictionally valid in Ohio. Thus, in addition to enforcing an order that had not been filed in Utah, the commissioner erred in refusing Holm a hearing on the jurisdiction of the Ohio court before enforcement of that order. Since none was permitted, a violation of Holm's due process rights occurred. *See id.*

### Commissioner Exceeded Authority

Lastly, Holm argues that the district court erred by permitting Commissioner Lema to perform non-delegable judicial acts. Numerous cases in Utah have held that the core functions of the various branches of government are nondelegable. *See, e.g., State v. Gallion,* 572 P.2d 683,

687 (Utah 1977) (Article VI, Section 1 of the Utah Constitution limits the legislature's ability to delegate legislative powers to others); *In re Bridwell,* 25 Utah 2d 1, 474 P.2d 116, 116 (Utah 1970) (the Utah Supreme Court cannot delegate its duty to discipline an erring attorney to others); *State v. Green,* 793 P.2d 912, 916 (Utah App.1990) ("crime definition and penalty powers are essential legislative functions that cannot constitutionally be delegated by the Utah Legislature to any other person or body"). Hence, our inquiry focuses on whether the duties delegated here involved the core functions of the judiciary.

Article VIII, Section 1 of the Utah Constitution provides:

The judicial power of the state shall be vested in a supreme court, in a trial court of general jurisdiction known as the district court, and in such other courts as the Legislature by statute may establish.

The specific judicial powers of the district courts are set out in Article VIII, Section 5 of the Utah Constitution:

The district court shall have original jurisdiction in all matters except as limited by this constitution or by statute[.]

"The term 'judicial power of courts' is generally understood to be the power to hear and determine controversies between adverse parties and questions in litigation." *Timpanogos Planning and Water Management Agency v. Central Utah Water Conservancy Distr.,* 690 P.2d 562, 569 (Utah 1984) (quoting *Citizens' Club v. Welling,* 83 Utah 81, 90, 27 P.2d 23, 26 (1933)). Judicial power includes "the *authority* to hear and determine justiciable controversies," *id.* (quoting *Galloway v. Truesdell,* 83 Nev. 13, 422 P.2d 237, 242 (1967)), and "to enforce any valid judgment, decree or order." *Id.* (quoting *Galloway,* 422 P.2d at 242). Judicial power is that which is "necessary to protect the fundamental integrity of the judicial branch," *In re Criminal Investigation, 7th Dist.Ct. No. CS–1,* 754 P.2d 633, 642 (Utah 1988), and "may not be wholly delegated to a nonjudicial officer." *Id.*

Implicit in the vesting of judicial power in Article VIII judges is a prohibition against any attempt to vest such power elsewhere. Just as a legislator could not authorize someone else to sit in his or her place and vote on legislation, neither can a judge appoint another person to sit in his or her place and conduct trials, make final orders and judgments, or otherwise exercise ultimate judicial power. Such constitutional judicial powers cannot be delegated. Such judicial powers can be exercised only by those who have been appointed pursuant to the requirements and safeguards set forth in the Utah Constitution.

This conclusion is further supported by an examination of the federal equivalent of commissioners, the magistrate system. In 1968, the United States Magistrates Act, 28 U.S.C.A. §§ 631 et seq. (1968), was passed, which allowed magistrates (formerly called commissioners) to perform certain duties in assistance to federal judges, but within the strict limitations of Article III of the United States Constitution, which provides in pertinent part:

> The judicial power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.

In considering the United States Magistrates Act, much concern centered on the possibility that the act might improperly delegate to magistrates duties reserved by the Constitution to Article III judges. *Mathews v. Weber,* 423 U.S. 261, 269, 96 S.Ct. 549, 554, 46 L.Ed.2d 483 (1976). The act resolved this concern by providing that, in all cases, the district court judge remains ultimately responsible. The magistrate acts under the direct supervision of the district judges, *id.,* 423 U.S. at 270, 96 S.Ct. at 554, and "authority for making final decisions remains at all times with the district judge." *Id.* (citation omitted); *accord United States v. Whitmire,* 595 F.2d 1303, 1305 (5th Cir.1979), *cert. denied,* 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980); *TPO, Inc. v. McMillen,* 460 F.2d 348, 359

(7th Cir.1972); *see generally* 28 USCA § 636. Federal courts have consistently upheld limitations on magistrates' authority. For instance, in *McMillen,* the Seventh Circuit held that magistrates lack the power to decide motions to dismiss or motions for summary judgment because both involve ultimate decision making. *McMillen,* 460 F.2d at 359. Moreover, the court stated that district courts have no authority to abdicate their decision making responsibility and cannot delegate such duties to magistrates. *Id.* In *Reed v. Bd. of Election Comm'rs of City of Cambridge,* 459 F.2d 121 (1st Cir.1972), the First Circuit similarly held that to the extent that a magistrate's memorandum and order purported to be a decision on the merits, particularly a final decision, it was an abnegation of the district court's judicial authority and therefore improper. *Id.* at 123; *see also Cason v. Owen,* 578 F.2d 572, 573 (5th Cir.1978) ("[O]nly a district judge can enter a final judgment in a civil case."); *Cruz v. Hauck,* 515 F.2d 322, 327 (5th Cir.1975) (magistrates are not empowered to hand down decisions in civil cases), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1118, 47 L.Ed.2d 322 (1976). Thus, it is clear that the authority vested in federal judges under the United States Constitution, Article III, Section 1, can only be exercised by Article III judges and cannot be delegated.[4]

Additionally, other states with commissioner systems reach the same conclusion. Numerous courts have stated that judicial power must be exercised by judges and cannot be delegated by the court to another body or person. *See, e.g., Mount v. State,* 45 Ala.App. 244, 228 So.2d 857 (Ala.Crim. App.1969); *In re Santa Cruz,* 8 Ariz.App. 349, 446 P.2d 253 (1969); *C.C.C. v. District Court for the Fourth Judicial Dist.,* 188 Colo. 437, 535 P.2d 1117 (1975); *General Motors Corp. v. Erves,* 399 Mich. 241, 249 N.W.2d 41 (1976); *Lewis v. Texas Dept. of Pub. Safety,* 407 S.W.2d 855 (Tex.Civ.App. 1966). The Wyoming Supreme Court has specifically stated that commissioners are

---

**4.** Magistrates may, however, with the consent of both parties perform certain judicial functions.

*See* 28 U.S.C.A. § 636(c)(1).

mere adjuncts of the court and are not in any manner distinct from the court of which they are commissioners. *Weber v. Johnston Fuel Liners, Inc.*, 519 P.2d 972, 977 (Wyo.1974); *accord State ex rel. Thompson v. Nash*, 27 Wis.2d 183, 133 N.W.2d 769, 775 (1965). That same court has more recently stated that "[t]he district court cannot delegate the power to hear, try, or determine a case to a court commissioner." *K.C. v. State*, 771 P.2d 774, 778 (Wyo.1989). "Simply put, '[g]eneral court commissioner responsibilities as a hearing examiner cannot be outspread, absent expansion of constitutional authorization, to include power of decisional finality within present constitutional terms. The differentiation is between adjunct fact finding and plenary judicial responsibility.'" *Id.* (quoting *Foster v. Foster*, 768 P.2d 1038, 1042 (Wyo.1989) (Urbigkit, J., specially concurring)). Similarly, the Indiana Supreme Court has held that the state legislature cannot vest commissioners with judicial duties which only the courts can constitutionally exercise. *State ex rel. Smith v. Starke Circuit Court*, 275 Ind. 483, 417 N.E.2d 1115, 1121–23 (1981). "A master commissioner is not a court, and judicial duties which courts only can exercise, can not be conferred upon him." *Id.* at 1121 (quoting *Shoultz v. McPheeters* 79 Ind. 373, 376 (1881)); *accord, Rodgers v. Rodgers*, 503 N.E.2d 1255, 1256–57 (Ind.App. 1987). Also, an Indiana Court of Appeals noted that a commissioner "acts as an instrumentality to inform and assist the court; only the court has authority to make final orders or judgments." *Breaziel v. State*, 568 N.E.2d 1072, 1073 (Ind.App. 1991) (citation omitted).

However, this does not mean that commissioners are without power to act within their limited authority. In the Federal system, magistrates are allowed to hear and determine, among other things, particular pretrial matters, to hold hearings and submit proposed findings of fact and recommendations for disposition, and to handle certain matters with the consent of the parties. *See generally* 28 U.S.C.A. § 636.

Likewise, while Utah commissioners have no authority to exercise ultimate judicial power, they are authorized to exercise certain functions to assist the judiciary in the exercise of its judicial power. The powers of commissioners at all times material herein were set forth at Utah Code Ann. § 78–3–31 (Supp.1990) and in the Judicial Council Rules of Judicial Administration. Utah Code Ann. § 78–3–31(9) (Supp.1990) expressly provides that the rules governing commissioners shall establish the "types of orders commissioners may *recommend,*" the "types of relief commissioners may *recommend,*" and provide a "procedure for timely *judicial review* of recommendations and orders made by court commissioners," *id.* (emphasis added), and Rule 3–201(9) directly parallels that provision. Rule 6–401 grants commissioners the authority and duty to, among other things, conduct hearings with parties and their counsel, and to make recommendations to the parties and the court regarding any issue in domestic relations. These provisions are clearly constitutional, since ultimate decision making remains with the judge.[5]

On the other hand, Utah Code Ann. § 78–3–31(6)(a) (Supp.1990) specifically states that court commissioners may not "make final orders except as otherwise provided by law," and Rule 3–201(9) similarly provides a specific "*prohibition against commissioners issuing final orders* except where otherwise permitted by law." *Id.* (emphasis added).[6] Additionally, Subsection 6(A) of Rule 6–401 states that

---

**5.** That rule also states that commissioners may adjudicate default and uncontested divorces and uncontested modifications and issue temporary or ex parte orders. Whether this provision constitutes an unconstitutional vesting of judicial power in commissioners is questionable. However, the present case involves Commissioner Lema's dismissal of Holm's motion for Utah to accept jurisdiction, an order which served as a final adjudication of her claim. Thus, since her actions clearly exceeded the scope of her authority, in violation of section 6–401(6), we need not address the constitutionality of this provision.

**6.** Commissioners could not be given by statute the power to make final orders, since such would be an unconstitutional vesting of ultimate judicial powers.

"[c]ommissioners shall not make final adjudications of domestic relations matters other than default or uncontested divorces and modifications." [7]

In the case at bar, Commissioner Lema exceeded her authority by attempting to exercise ultimate judicial power in: (1) deciding Holm's motion for Utah to assume jurisdiction; (2) informing Holm's attorney that it was *her order* that the Ohio change of custody order be enforced that night; (3) ordering the police to enforce the undomesticated Ohio order; and (4) denying Holm's attorney's request for a hearing before the court with regard to the undomesticated Ohio order. Such was done without authority, and in violation of constitutional principles, and thus, constituted an unconstitutional exercise of judicial power.

In performing the acts enumerated above, Commissioner Lema not only exceeded the bounds of her authority as provided by the Judicial Council Rules of Judicial Administration, *see* Rule 6–401(6)(A), but she also assumed judicial power in violation of Article VIII, Section 1 of the Utah Constitution. Denying a motion for Utah to assume jurisdiction involves a final determination of a cause of action and is therefore clearly a judicial function. *See, e.g., McMillen,* 460 F.2d at 359; *Breaziel,* 568 N.E.2d at 1073. Such power must be exercised solely by a judge, not a commissioner.

And such error could not be cured by ratification by Judge Eves. Judge Eves did not have the authority to delegate away his judicial power to an employee in the

first place. *K.C. v. State,* 771 P.2d at 778; *accord Mount,* 228 So.2d at 858; *In· re Santa Cruz,* 446 P.2d at 255; *C.C.C. v. District Court for the Fourth Judicial Dist.,* 535 P.2d at 1119; *Erves,* 249 N.W.2d at 49; *Lewis,* 407 S.W.2d at 856; *see generally McMillen,* 460 F.2d at 359; *Reed,* 459 F.2d at 121. Consequently, he could not subsequently ratify that employee's illegal judicial acts as his own.

The reasons for the constitutional limitation of the exercise of judicial power to Article VIII judges is clear. Judges are selected and retained by a constitutional process which includes nomination by committee, appointment by the Governor, approval of the Utah Senate, and approval of the public by periodic retention elections. They are also subject to the Judicial Conduct Commission, which has the power of sanction by reprimand, censure, or removal. Utah Const. art. VIII, § 13. The result of this process is broad public accountability. However, no such process is involved in the selection of commissioners, who are simply appointed by the Judicial Council with the approval of a majority of the district court judges in the district in which the commissioner will serve. *See* Utah Code Ann. § 78–3–31(2)(a) (Supp.1990). Commissioners have no accountability to the public, but only to the judges for whom they work. The people have a right to have their cases and controversies ultimately decided by Article VIII judges who have been vested with judicial power by the constitution. Anything less is a clear violation of the Utah constitution and Utah law.[8]

---

7. Rule 6–401(6)(B) also provides that commissioners shall not serve as pro tempore judges in any matter, except as provided by Rule of the Supreme Court.

8. Although appellate courts "should avoid addressing constitutional issues unless required to do so," *State v. Anderson,* 701 P.2d 1099, 1103 (Utah 1985) (footnote omitted), such is necessary here. Since Commissioner Lema's actions were clearly in violation of Utah Code Ann. § 78–3–31(6)(b) (Supp.1991) and Rule 6–401(6)(A) of the Judicial Council Rules of Judicial Administration, we can conclude that the commissioner exceeded her authority without reaching the constitutionality of her actions. However, we are nonetheless compelled to address the constitutionality of Judge Eves's delegation of authority to Commissioner Lema to engage in ultimate judicial decision making, by allowing her to hear, decide, and dismiss Holm's cause of action on August 22, 1991, for lack of jurisdiction.

At a hearing held on September 4, Judge Eves stated that Commissioner Lema had called him on the night of August 22 and "told [him] that *she was going to deny jurisdiction* in the matter." Later in that same hearing, he said, "We had no jurisdiction in the matter. *The commissioner had so determined.*" He also stated that he "simply reaffirmed *Commissioner Lema's determination* that we had no jurisdiction in the matter." In allowing Commissioner Lema to make this jurisdictional determination, Judge

### Sanctions

■ Lastly, Smilowitz seeks sanctions against Holm for a frivolous appeal, pursuant to Rule 33 of the Utah Rules of Appellate Procedure. A frivolous appeal is "[o]ne in which no justiciable question has been presented and ... is readily recognizable as devoid of merit in that there is little prospect that it can ever succeed." *Farrell v. Porter*, 830 P.2d 299, 302 (Utah App.1992) (quoting *Hunt v. Hurst*, 785 P.2d 414, 416 (Utah 1990)). Since the outcome of our opinion indicates that Holm's appeal was meritorious, we deny Smilowitz's request for Rule 33 sanctions.

### CONCLUSION

The district court and its commissioner erred in concluding that Utah did not have jurisdiction in this matter, in enforcing the Ohio change of custody order that had not been filed in Utah, and in refusing to allow Holm a hearing before enforcing the Ohio change of custody order. Furthermore, the district court erred in permitting Commissioner Lema to exceed her authority, and Commissioner Lema erred by exceeding her authority and attempting to assume judicial power in violation of the Utah Constitution and Utah law. In addition, Smilowitz's request for sanctions is denied. This matter is reversed and remanded to the district court for further proceedings consistent with this opinion.

ORME, Judge (concurring specially):

Judge Billings and I concur fully in the court's opinion except in one limited respect. Our disagreement concerns the discussion of the nondelegability of core judicial functions as a matter of constitutional law. In our view, such discussion would be necessary only if the controlling statute and rule, by their terms, purported to vest commissioners with the power exercised by the commissioner in this case. If they did, it would become necessary to consider whether these enactments were constitutional. However, since the commissioner's actions were not even authorized by statute or rule, we see no need to opine about the *constitutional* implications of such actions.[1]

A determination of whether this kind of authority could constitutionally be delegated to quasi-judicial officers should properly await some actual attempt at delegation of such authority. Where such delegation has not occurred, discussion about the constitutional propriety of such a scheme is dicta.

---

Eves impermissibly delegated ultimate judicial power to her. Since Judge Eves derives his authority from the Utah Constitution, and not from the Utah Code or the Rules of Judicial Administration, the constitutionality of such delegation must be addressed.

1. In footnote 8 of the main opinion, it is suggested that the constitutional issue must be decided because Judge Eves made a delegation of authority to the commissioner and, "Judge Eves derives his authority from the Utah Constitution."

It is true that the district court is specifically recognized in the Utah Constitution as a repository of "[t]he judicial power of the state." Utah Const. art. VIII, § 1. *See also id.* § 5. But essentially all of the details concerning the ways and means of exercising that power are established by statute and rule. While it is possible that the Judicial Council would have the power to establish commissioners by rule even without specific authorizing legislation, *see* Utah Const. art. VIII, § 12, as matters stand, commissioners are authorized by statute, with authority "as provided by this section and rules of the Judicial Council." Utah Code Ann. § 78-3-31(1)(a) (1992). No statute or rule purports to vest an individual judge with the power to expand upon this carefully delineated authority.

Thus, even if it is true that Judge Eves undertook to delegate to the commissioner "ultimate judicial decision making" in this case, it is unnecessary to look to the constitution in deciding the validity of that delegation. It is enough to observe that neither the applicable statute nor any rule of the Judicial Council even arguably permits such a delegation. Such delegation, then, is contrary to state statute and contrary to Council rule. Having said so, it is simply unnecessary to comment on its constitutionality other than, perhaps, to note that the judicial power referred to in art. VIII, § 1, does not vest an individual district court judge, acting with no basis in statute or rule, to delegate to a commissioner *any* authority not otherwise permitted by statute or rule. But this proposition holds true across the board and is not limited to functions which are characterized as core judicial functions.

Given the institutional proscription against reaching constitutional issues unnecessarily, we do not join in this dicta, even though it makes a good point for the consideration of the Legislature and the Judicial Council as those entities continue the on-going effort to delineate the proper role and authority of commissioners in this state's judicial system.

BILLINGS, J., concurs.