2001 UT App 367

**Jayni SEARLE, Appellant,**

v.

**Boyd SEARLE and Dorothy Searle, Appellees.**

**Nos. 20000274–CA, 990726–CA.**

Court of Appeals of Utah.

Dec. 6, 2001.

Jim C. Shirley, Salt Lake City, for Appellant.

Maria Cristina Santana, Salt Lake City, for Appellees.

Before Judges JACKSON, BENCH, and BILLINGS.

## OPINION

JACKSON, Associate Presiding Judge.

¶ 1 Jayni Searle (Mother) first appeals the Utah Third District Court's (District Court) order denying her petition for writ of assistance to enforce a foreign jurisdiction's temporary custody order. In a separate appeal, Mother appeals an order setting aside the District Court's August 25, 1999 Entry of Judgment, which recognized the foreign jurisdiction's permanent custody decree under the Utah Foreign Judgment Act, Utah Code Ann. §§ 78–22a–1 to –8 (1996) (Foreign Judgment Act). "We consolidate the appeals for purposes of this opinion." *Webb v. R.O.A. Gen., Inc.*, 804 P.2d 547, 548 (Utah Ct.App.1991). We dismiss Mother's first appeal as moot in light of our conclusion in Mother's second appeal. We vacate the District Court's Order Setting Aside Judgment of Mother's second appeal, and confirm the immediate enforceability of the August 25, 1999 Entry of Judgment.

## BACKGROUND

¶ 2 Mother is a member of the Fort Peck Assiniboine and Sioux Tribes (Tribe). Mother married Boyd Carl Searle (Father) in September 1986. C.S. was born four months after Mother and Father married, but Father was not the biological father of C.S.[1] Mother

---

1. C.S. is an Indian child according to the following definition in 25 U.S.C.A. § 1903(4) (West 2001): " 'Indian child' means any unmarried person who is under age eighteen and is either

and Father divorced seven years later in 1993, and were awarded joint legal custody of C.S. by the District Court. Mother was awarded physical custody of C.S., subject to Father's extended visitation rights during June, July, and August, and during the winter school break. Father died in February 1998, while C.S. was in his custody.

¶ 3 After Father died, Father's parents (Grandparents) brought C.S. into their custody and filed a petition to terminate Mother's parental rights on February 23, 1998, in the Utah Third District Juvenile Court (Juvenile Court). The Juvenile Court awarded Grandparents temporary custody of C.S. at an ex parte temporary custody hearing on March 3, 1998. Grandparents did not serve notice of the ex parte hearing on Mother or the Tribe. The Tribe made a Motion to Intervene in the child custody proceeding on March 24, 1998, which the Juvenile Court granted as required by the Indian Child Welfare Act, 25 U.S.C.A. §§ 1901–1963 (West 2001) (ICWA).[2] On May 15, 1998, the Juvenile Court granted Mother's Petition to Transfer Jurisdiction to the Fort Peck Tribal Court (Tribal Court).

¶ 4 The Tribal Court entered an ex parte order on May 22, 1998, accepting exclusive jurisdiction and granting temporary custody to Mother. Grandparents did not receive any notice of the proceeding, nor were they aware of the possibility that the Tribal Court might modify the Juvenile Court's temporary custody order. After the Tribal Court entered the ex parte custody order, Mother's counsel filed a Motion for Writ of Assistance with the District Court on May 28, 1998, to enforce the Tribal Court's temporary custody order. Mother named only the paternal grandfather of C.S. as defendant in her petition for writ of assistance.[3] The District Court signed the writ of assistance on June 2, 1998, but delayed issuance to allow Grandparents to seek a stay in another court. On

June 3, 1998, the Juvenile Court issued a stay of its May 15, 1998 order, which had transferred jurisdiction to the Tribal Court. Mother informed the District Court that she would not execute on the writ of assistance pending a resolution of the Juvenile Court's June 3, 1998 stay.

¶ 5 The Juvenile Court held a joint conference call hearing with the Tribal Court, at which counsel for both parties and the Tribe were present. The two courts concluded that the Juvenile Court would stay its order transferring jurisdiction to the Tribal Court so a higher court could review the jurisdictional question, and agreed that the Tribal Court would stay its temporary custody order pending that review.

¶ 6 On Mother's petition, we entered an order on September 1, 1998, stating, "[t]he juvenile court transferred jurisdiction over issues concerning the minor, C.S., to the Fort Peck Tribal Court and the tribal court accepted jurisdiction over the matter." Accordingly, we concluded that "the juvenile court no longer had jurisdiction over the matter," and we vacated "any orders issued by the juvenile court after May 22, 1998."

¶ 7 On September 1, 1998, as litigation resumed in the Tribal Court, Grandparents filed a motion for voluntary dismissal of their petition to terminate Mother's parental rights. Mother filed a motion for sole custody in the Tribal Court on September 8, 1998, and stipulated to the dismissal of Grandparents' petition. On September 9, 1998, the Tribal Court dismissed Grandparents' action, but retained jurisdiction over Mother's motion for sole custody of C.S. The Tribal Court's order also continued its May 22, 1998 temporary custody order. Grandparent's received notice of Mother's action for sole custody of C.S., but submitted no pleadings to, nor made any appearances before, the Tribal

(a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."

2. "In any State court proceeding for ... termination of parental rights to[ ] an Indian child, ... the Indian child's tribe[ ] shall have a right to intervene at any point in the proceeding." 25 U.S.C.A. § 1911(c) (West 2001).

3. In Mother's first appeal, she named only C.S.'s paternal grandfather as the defendant party. In her second appeal, Mother named both paternal grandparents as the defendant party. For convenience, we refer to the defendant parties of both appeals as "Grandparents."

Court. On October 16, 1998, the Tribal Court entered a default judgment against Grandparents awarding full custody to Mother. On November 2, 1998, pursuant to Mother's motion, the Tribal Court issued an order to show cause, directing Grandparents to appear for a hearing on November 19, 1998. Grandparents failed to appear at the hearing, and the Tribal Court held Grandparents in contempt of court. The Tribal Court also issued a bench warrant for the arrest of Grandparents and C.S., stating it would lift the warrant and stay all jail time once Grandparents agreed to return C.S. to the reservation.

¶ 8 On March 8, 1999, the District Court denied Mother's petition for writ of assistance to enforce the May 22, 1998 temporary custody order on the grounds that Mother failed to comply with the Utah Foreign Judgment Act, and because Grandparents were denied due process at the May 22, 1998 Tribal Court hearing. Mother's first appeal is from the District Court's denial of her petition for writ of assistance.

¶ 9 On June 15, 1999, Mother filed both the Tribal Court's October 16, 1998 permanent custody decree and an Affidavit in Support of Entry of Foreign Judgment with the District Court. That same day, the clerk of the District Court mailed a Notice of Judgment to Grandparents. Grandparents filed various motions with accompanying memoranda over the next month and a half. However, on August 25, 1999, because Grandparents made no argument why the foreign judgment should not be recognized, the District Court "recognize[d] and [gave] full faith and credit to the October 16, 1998 order of the Fort Peck Tribal Court."

¶ 10 Counsel for Mother picked up C.S. from school and entrusted him to Tribal law enforcement for return to his mother. However, Tribal law enforcement failed to deliver C.S. to Mother. Grandparents, who knew C.S.'s whereabouts, then filed a motion for a protective order, and later filed a motion under Rule 60(b) of the Utah Rules of Civil Procedure to set aside the District Court's August 25, 1999 Entry of Judgment.

¶ 11 The District Court granted Grandparents' motion to set aside the August 25, 1999 judgment, stating,

> The Court rules that the October 16th Tribal Court Decree directly relates to and stems from an Order which another court has concluded to not be entitled to full faith and credit. Specifically, the Decree reinforces the May 22nd Order and reiterates that it "is hereby continued." The October 16th Decree is therefore flawed because it maintains custody of the minor child under an Order which was issued without giving [Grandparents their] due process right to be heard. Accordingly, the October 16th Order is similarly not entitled to full faith and credit.

Mother's second appeal is from this ruling.

## ISSUES AND STANDARDS OF REVIEW

¶ 12 In Mother's first appeal, she argues that the District Court incorrectly denied her petition for writ of assistance. We will address this appeal only to conclude that, in light of our disposition of Mother's second appeal, the first is moot.

¶ 13 Mother's second appeal asserts that the District Court incorrectly granted Grandparents' motion to set aside the judgment recognizing the foreign permanent custody decree. We review a district court's decision on a Rule 60(b) motion to set aside a judgment under an abuse of discretion standard. *See Lund v. Brown*, 2000 UT 75, ¶¶ 9–11, 11 P.3d 277; *Gillmor v. Wright*, 850 P.2d 431, 434 (Utah 1993). " 'An appeal of a Rule 60(b) order addresses only the propriety of the denial or grant of relief,' " and thus " 'is narrow in scope.' " *Franklin Covey Client Sales, Inc. v. Melvin*, 2000 UT App 110, ¶ 19, 2 P.3d 451 (quoting 12 James Wm. Moore et al., *Moore's Federal Practice* § 60.41[1][a] (3d ed.1999)). However, we can "reach the merits of the underlying judgment from which relief was sought," *id.*, to determine whether the district court abused its discretion. *See Lund*, 11 P.3d 277, 2000 UT 75 at ¶ 9 ("A decision premised on flawed legal conclusions, for instance, constitutes an abuse of discretion.").

## ANALYSIS

¶ 14 Initially, we explain why Mother's first appeal is moot. Next, we evaluate whether the District Court abused its discretion in granting Grandparents' Rule 60(b) motion.

### I. Mother's First Appeal

 ¶ 15 Mother first appeals the District Court's denial of her petition for writ of assistance. She asked the District Court to enforce a temporary custody order rendered by the Tribal Court. When a temporary order is followed by a permanent order, the temporary order merges into the permanent order. *See Birch Creek Irrigation v. Prothero*, 858 P.2d 990, 994 (Utah 1993). Here, the May 22, 1998 temporary custody order was followed by a permanent custody decree on October 16, 1998. Mother appealed both the temporary order and succeeding permanent decree. However, the Tribal Court's May 22, 1998 temporary custody order merged with its October 16, 1998 decree. Accordingly, the appeal from the temporary custody order is dismissed as moot.

### II. Mother's Second Appeal

¶ 16 Mother next appeals the District Court's decision granting Grandparents' motion to set aside the August 25, 1999 Entry of Judgment. First we address whether Mother properly preserved her arguments for appeal and whether the doctrine of res judicata precludes this second appeal. We then evaluate whether the District Court abused its discretion in granting Grandparents' Rule 60(b) motion.

### A. Preservation

 ¶ 17 "Before we examine the [District Court's] decision, we must resolve whether [Mother] failed to preserve below the issues [she] now raises on appeal." *Sittner v. Schriever*, 2000 UT 45,¶ 15, 2 P.3d 442. Grandparents assert that Mother failed to preserve her challenge to their Rule 60(b) motion. " '[T]o preserve an issue for appellate review, a party must first raise the issue in the trial court,' giving that court an opportunity to rule on the issue." *State v. Maguire*, 1999 UT App 45,¶ 6, 975 P.2d 476

(quoting *Badger v. Brooklyn Canal Co.*, 966 P.2d 844, 847 (Utah 1998)). The District Court then " 'has the opportunity to rule if the following three requirements are met: (1) "the issue must be raised in a timely fashion;" (2) "the issue must be specifically raised;" and (3) a party must introduce "supporting evidence or relevant legal authority." ' " *Id.* A party is not required "to file a post-judgment motion before the [district] court as a prerequisite to filing an appeal." *Sittner*, 2 P.3d 442, 2000 UT 45 at ¶ 16.

 ¶ 18 Here, Mother timely and specifically objected in her response to Grandparents' Rule 60(b) motion. Mother argued several reasons why the District Court should not grant the Rule 60(b) motion, providing both " ' "supporting evidence [and] relevant legal authority." ' " *Maguire*, 1999 UT App 45 at ¶ 6 (citations omitted). Thus, we conclude that Mother's written arguments preserved the issue for appeal without the need "to file a post-judgment motion before the [district] court." *Sittner*, 2 P.3d 442, 2000 UT 45 at ¶ 16.

### B. Res Judicata

 ¶ 19 Grandparents also argue that res judicata barred recognition of the October 16, 1998 permanent custody decree. However, res judicata does not apply in this case. "Res judicata has two branches: claim preclusion, barring the relitigation of previously litigated claims between the same parties; and issue preclusion, barring relitigation of issues decided, although the causes of action or claims are not the same." *In re H.J.*, 1999 UT App 238,¶ 37, 986 P.2d 115. The supreme court observed that "[t]emporary custody is the right to take care of the children during a transitional time. Parents of the child retain residual rights, and the court retains continuing jurisdiction." *Id.* at ¶ 39. Accordingly, the court stated, "temporary custody is not a permanent placement," and explained that "[d]ifferent rights and duties are involved in temporary custody versus [permanent custody]." *Id.* Thus, because temporary and permanent custody claims differ, claim preclusion does not apply. *See id.*

¶ 20 Further, the "legal issues of temporary custody and permanent [custody] are different; therefore separate hearings are required." *Id.* at ¶ 41. Similarly, we conclude that recognition of the Tribal Court's October 16, 1998 permanent custody decree involves different issues than enforcement of that court's May 22, 1998 temporary custody order. Thus, issue preclusion does not apply. Moreover, "this court has often expressed concern over strictly applying the doctrine of res judicata in a juvenile court setting when the best interests of the children are at stake." *Id.* at ¶ 36. Accordingly, res judicata does not bar enforcement of the October 16, 1998 permanent custody decree.

## C. Rule 60(b) Motion

¶ 21 Mother asserts that the District Court "improperly granted the Rule 60(b) motion to set aside the August 25, 1999 entry of judgment." We review a district court's ruling on a Rule 60(b) motion to set aside a judgment under an abuse of discretion standard. *See Lund v. Brown,* 2000 UT 75, ¶ 9, 11 P.3d 277. The "court's ruling must be 'based on adequate findings of fact' and 'on the law,'" thus, "[a] decision premised on flawed legal conclusions ... constitutes an abuse of discretion." *Id.*

¶ 22 Grandparents set forth no responsive argument to Mother's arguments on appeal, they merely point to Mother's procedural deficiencies. In the District Court, Grandparents argued Rule 60(b)(3)-(6) of the Utah Rules of Civil Procedure provided grounds to set aside the August 25, 1999 judgment. *See* Utah R. Civ. P. 60(b)(3)-(6) (stating, a party may be relieved from a judgment for "(3) fraud ..., misrepresentation or other misconduct of an adverse party; (4) the judgment is void; (5) ... a prior judgment upon which [the judgment in question] is based has been reversed or otherwise vacated ...; or (6) any other reason justifying relief from the operation of the judgment"). Grandparents assert that the refusal to enforce the Tribal Court's May 22, 1998 temporary custody order for lack of due process also ren-

dered the Tribal Court's October 16, 1998 permanent custody decree invalid.

1. Applicability of the Utah Foreign Judgment Act

¶ 23 Grandparents' Rule 60(b) motion attacks the court's recognition of a foreign judgment under the Foreign Judgment Act; thus, we first evaluate Foreign Judgment Act's applicability. The Foreign Judgment Act defines a foreign judgment as "any judgment, decree, or order of a court of the United States or of any other court whose acts are entitled to full faith and credit in this state." Utah Code Ann. § 78–22a–2 (1996). Contrary to its apparent meaning, "the Full Faith and Credit Clause [of the Foreign Judgment Act] does not [generally] apply to foreign *country* judgments." *Mori v. Mori,* 931 P.2d 854, 856 (Utah 1997) (emphasis added). Utah courts may only extend full faith and credit to judgments of jurisdictions other than those "of the United States," Utah Code Ann. § 78–22a–2 (1996), when treaty or statute allows such treatment. *See id.* ("Absent a treaty or statute, a foreign country judgment can be enforced only under principles of comity."); *see also Aetna Life Ins. Co. v. Tremblay,* 223 U.S. 185, 190, 32 S.Ct. 309, 310, 56 L.Ed. 398 (1912) ("The [first] section of [Art. IV] of the [United States] Constitution confers the right to have full faith and credit 'given in each State to the public acts, records, and judicial proceedings in every other State.' No such right, privilege or immunity, however, is conferred by the Constitution or by any statute of the United States in respect to the judgments of foreign states or nations, and we are referred to no treaty relative to such a right.").

¶ 24 The issues before this court involve orders rendered by the Tribal Court about the custody of an Indian child, and were initiated by Grandparents' petition to terminate Mother's parental rights. The nature of the proceedings requires the application of ICWA.[4] Although Indian tribes and nations are not states whose judgments are entitled per se to full faith and credit, ICWA

---

4. Child custody proceedings, as defined in ICWA, include foster care placement, termination of parental rights, preadoptive placement, and adop-

tive placement. *See* 25 U.S.C.A. § 1903(1) (West 2001).

specifically directs that "every State ... shall give full faith and credit to the ... judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the ... judicial proceedings of any other entity." 25 U.S.C.A. § 1911(d) (West 2001). Accordingly, as required by statute, the child custody orders rendered by the Tribal Court are entitled to full faith and credit, so long as they comply with the requirements of the Foreign Judgment Act.[5]

### 2. Recognition of a Foreign Judgment

¶ 25 To be recognized as a Utah judgment under the Foreign Judgment Act, "[a] copy of a foreign judgment authenticated in accordance with an appropriate act of Congress or an appropriate act of Utah may be filed with the clerk of any district court in Utah." Utah Code Ann. § 78–22a–2(2) (1996). Next, the person seeking to enforce the foreign judgment, the "judgment creditor," must ensure that the affected parties, the "judgment debtor[s]," are given notice of the filing. *Id.* § 78–22a–3(1). The judgment creditor must first "file an affidavit with the clerk of the district court stating the last known address of the judgment debtor and the judgment creditor." *Id.* The clerk of the court must then send notice of the foreign judgment to the judgment debtor at his or her last known address, indicating the name and address of the judgment creditor and the judgment creditor's attorney. *See id.* § 78–22a–3(2). Execution of the foreign judgment may be issued "30 days after the judgment is filed." *Id.* § 78–22a–3(3).

¶ 26 Initially, Mother filed the Tribal Court's October 16, 1998 permanent custody decree with the clerk of the District Court on June 15, 1999, as required by the Foreign Judgment Act. *See id.* § 78–22a–2(2). Also on June 15, 1999, Mother filed "an affidavit with the clerk of the district court stating the last known post-office address of the judgment debtor and the judgment creditor." *Id.* § 78–22a–3(1). That same day, the clerk of the court "notif[ied] the judgment debtor that the judgment [had] been filed." *Id.* § 78–22a–3(2). Finally, the District Court waited for a period of more than thirty days, as required by the Foreign Judgment Act, *see id.* § 78–22a–3(3), entering judgment August 25, 1999, recognizing the October 16, 1999 permanent custody decree. Thus, Mother fully complied with the requirements of the Foreign Judgment Act.

¶ 27 Although Mother complied with the procedural requirements of the Foreign Judgment Act, the foreign judgment must also be enforceable. The Utah Supreme Court reviewed the enforcement of a foreign judgment in *In re Estate of Jones*, 858 P.2d 983 (Utah 1993). The court stated that "only judgments that are both valid and final generally are entitled to full faith and credit." *Id.* at 985. The court in *Estate of Jones* also addressed how a foreign judgment may not be attacked: there, the testator's son (Jones) argued that a California judgment should not be given full faith and credit "because the California court erred in applying California law." *Id.* Our supreme court explained that "a foreign judgment that is both valid and final cannot be collaterally attacked even if grounded on errors of law or fact." *Id.* Thus, a Utah court can only review the foreign judgment for its finality and validity.

### a. Finality

¶ 28 Mother claims the order is final under the Fort Peck Rules of Appellate Pro-

---

5. We have stated,

> it is ... clear that a foreign judgment must first be filed in Utah in order for it to become an enforceable Utah order, and furthermore, that the parties are, in most circumstances, entitled to a hearing on the foreign order to examine the narrow issue of whether the other ... court had jurisdiction when it rendered its order.

*Holm v. Smilowitz,* 840 P.2d 157, 163 (Utah Ct.App.1992). "Before enactment of the Foreign Judgment Act, 'the traditional method of enforcing a foreign judgment was to file an action on the judgment in a Utah court' in a civil action to enforce the judgment." *Mori,* 896 P.2d at 1240 (quoting *Pan Energy v. Martin,* 813 P.2d 1142, 1143 (Utah 1991)). The traditional method is still a viable option for enforcing foreign judgments in Utah. *See Pan Energy,* 813 P.2d at 1143; *Smilowitz,* 840 P.2d at 163 n. 3. *But see Smilowitz,* 840 P.2d at 163 ("Thus, enforcement of a foreign custody decree pursuant to the [Uniform Child Custody Jurisdiction Act] must be accomplished in compliance with provisions of the Utah Foreign Judgment Act...."). Here, Mother sought recognition of the Tribal Court's October 16, 1998 permanent custody decree under the Foreign Judgment Act.

316

cedure for interlocutory appeal. *See* Fort Peck R.App. P. 6 (defining "an interlocutory appeal . . . as an appeal from a *final order* of the Tribal Court" (emphasis added)). In *Estate of Jones,* the court stated that "the [foreign] judgment must be final according to the laws of the state of rendition" for Utah courts to extend full faith and credit. *Estate of Jones,* 858 P.2d at 986. In that case, the personal representative of the estate filed an action in California for distribution of property, and Jones received notice of the action. *See id.* In discussing the finality of the California judgment, the supreme court explained,

> The California judgment is final because the trial court judgment was not appealed. The California Rules of Court provide a specific time period in which to appeal from entry of judgment. *See* Cal. R. Ct. § 2(a). Jones did not appear or participate in the California litigation, nor did he attempt to appeal the California judgment. He does not contend here that the judgment is not final. Therefore, we conclude that the California judgment became final when the period to appeal expired.

*Id.* at 986.

¶ 29 The instant case is identical. Grandparents received notice of the proceedings culminating in the October 16, 1998 permanent custody decree, but "did not appear or participate in the [Tribal Court] litigation, nor did [they] attempt to appeal the [Tribal Court] judgment," *id.,* within the fifteen day period allotted for filing appeals in the Fort Peck judicial system. *See* Comprehensive Code of Justice of the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation tit. II, §§ 206, 207 (2000), *at* http://www.ftpeckcourts.org/CCOJ/Title 002.html; Fort Peck R.App.P. 6, *at* http://www.ftpeckcourts.org/CCOJ/Rules_of_Procedure.html. Further, Grandparents do "not contend here that the judgment is not final." *Estate of Jones,* 858 P.2d at 986. Accordingly, "we conclude that the [Tribal Court's October 16, 1998 permanent custody decree] became final when the period to appeal expired." *Id.*

b. Validity

¶ 30 We evaluate the following two factors when determining the validity of a judgment: (1) whether the "judgment [was] rendered by a court with competent jurisdiction," and (2), whether the judgment was rendered "in compliance with the constitutional requirements of due process." *Id.* at 985. Here, the District Court denied enforcement by setting aside its August 25, 1999 Entry of Judgment because "[t]he October 16th Tribal Court Decree directly relates to and stems from an Order which another court . . . concluded not to be entitled to full faith and credit." The District Court concluded that "[t]he October 16th Decree is . . . flawed because it maintains custody of the minor child under an Order which was issued without giving [Grandparents their] due process right to be heard." Thus, the District Court concluded that the due process violation in the Tribal Court's May 22, 1998 temporary custody order proceedings invalidated the Tribal Court's October 16, 1998 permanent custody decree. We disagree.

(1) Jurisdiction

¶ 31 First we examine whether the Tribal Court had jurisdiction to rule on the custody of C.S. Because C.S. is an Indian child and this is a child custody proceeding, *see* 25 U.S.C.A. § 1903(1) (West 2001), ICWA vests either exclusive or concurrent jurisdiction in the Tribal Court, if it accepts jurisdiction. *See id.* § 1911. If the "Indian child . . . resides or is domiciled within the reservation," the "Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding." *Id.* § 1911(a); *accord Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 42, 109 S.Ct. 1597, 1605, 104 L.Ed.2d 29 (1989). " 'Section 1911(b) . . . creates concurrent but presumptively tribal jurisdiction in the case of children not domiciled on the reservation.' " *In re D.A.C.,* 933 P.2d 993, 997 (Utah Ct.App.1997) (alteration in original) (quoting *Holyfield,* 490 U.S. at 36, 109 S.Ct. at 1601–02). Thus, a state court "shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent," and "in the absence of good

cause to the contrary." *See* 25 U.S.C.A. § 1911(b) (West 2001).

¶ 32 Here, Mother initially filed a petition to transfer jurisdiction under 25 U.S.C.A. § 1911(b) for concurrent jurisdiction, but then amended the petition to seek exclusive jurisdiction in the Tribal Court pursuant to 25 U.S.C.A. § 1911(a). The Juvenile Court granted Mother's petition, transferring jurisdiction to the Tribal Court. However, if C.S. was not domiciled on the reservation, the Juvenile Court could have erred by failing to hold a hearing to determine whether good cause exists not to transfer jurisdiction to the Tribal Court.[6] *Cf. In re D.A.C.*, 933 P.2d at 996; *In re Adoption of S.S.*, 167 Ill.2d 250, 212 Ill.Dec. 590, 657 N.E.2d 935, 942–43 (1995). C.S. resided in Utah with Grandparents, who were domiciled in Utah, when the initial actions for termination of parental rights and temporary custody of C.S. were filed. At the time of the filing, Mother resided on, and was domiciled within the reservation. Thus, we must decide which domicile prevails as the Indian child's domicile.

■■■■ ¶ 33 Federal law, not state law, determines the domicile of an Indian child. *See Holyfield*, 490 U.S. at 47, 109 S.Ct. at 1607 ("We therefore think it beyond dispute that Congress intended a uniform federal law of domicile for … ICWA." (Footnote omitted.)). In *Holyfield*, the Supreme Court considered whether twin Indian children born out of wedlock were domiciled on the reservation, even though the mother left the reservation to give birth to the children and to put them up for adoption, and the children never resided on the reservation. *See id.* at 37–38, 42, 109 S.Ct. at 1602–03, 1605. First, the Supreme Court noted that, for adults, "domicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." *Id.* at 48, 109 S.Ct. at 1608. Establishing a minor's domicile requires a different analysis. "Since most minors are legally incapable of forming the requisite intent to establish a domicile, their domicile is determined by that of their parents." *Id.; see also In re Adoption of Halloway*, 732 P.2d 962, 968 (Utah 1986) ("[L]ike Utah, most states hold that a minor child's domicile is that of his or her parents."). Further, the Supreme Court noted that "it is entirely logical that '[o]n occasion, a child's domicile of origin will be in a place where the child has never been.'" *Id.* (quoting Restatement of American Conflicts Law § 14 cmt. b (1986)). The Supreme Court in *Holyfield* determined that even "though [the twins] had never been there," the Indian children were domiciled on the reservation because "the domicile of the mother (as well as the father) [had] been, at all relevant times, on the Choctaw Reservation." *Id.* at 48–49, 109 S.Ct. at 1608. When parents are divorced and one parent dies, the child acquires the domicile of the surviving spouse.[7] *See* 25 Am.Jur.2d *Domicil* §§ 42 (stating, "the child's domicil is that of the parent having custody"), 43 ("Upon the death of the parent having custody of the child, the domicil of the child becomes that of the surviving parent.");

6. We determined, in an order dated September 1, 1998, that the Juvenile Court had transferred jurisdiction to the Tribal Court and no longer had jurisdiction to enter further orders.

7. The present case was initiated by Grandparents' petition to terminate Mother's parental rights. Grandparents argued that Mother abandoned C.S., thus, his domicile was with them, not with Mother on the reservation. *See In re Adoption of S.S.*, 167 Ill.2d 250, 212 Ill.Dec. 590, 657 N.E.2d 935, 942 (1995) ("If a child is left parentless as a result of death and/or abandonment, and no legal guardian of the child's person has been appointed, the child takes the domicile of the person who stands in loco parentis to him and with whom he lives." (Citing Restatement (Second) of Conflict of Laws § 22 cmt. i (1971).)). The petition was transferred to the Fort Peck Tribal Court on May 15, 1998, then was dismissed because Grandparents voluntarily requested dismissal. Abandonment was never adjudged in the Juvenile Court or the Tribal Court, thus the issue could have been cause for remand. *See id.* (stating that an abandonment determination is appropriate to determine domicile of Indian child whose custodial non-Indian father died while non-custodial Indian mother was domiciliary of the reservation, as long as abandonment was not "part of a scheme to facilitate adoption of [Indian] children by non-Indians"); *see also, Holyfield*, 490 U.S. at 51–52, 109 S.Ct. at 1610; *Adoption of Halloway*, 732 P.2d at 969 (Utah 1986). However, Grandparents voluntarily dismissed their claim, and the issue is not now before this court on appeal, nor before any other court. Accordingly, we do not address this issue further.

Restatement (Second) of Conflict of Laws § 21 cmt. d (1971) ("A child's domicil, in the case of the divorce or separation . . ., is the same as that of the parent to whose custody he has been legally given. . . . Upon the death of the parent to whose custody the child has been awarded or with whom the child has been living, the child's domicil shifts to that of the other parent even though the latter is domiciled in another state."); G. Van Ingen, Annotation, *Does Child, upon Death of Parent to Whom Custody Had Been Awarded by Decree of Divorce, Take Domicil of the Other Parent?* 136 A.L.R. 914 (1937) (answering question raised by title in the affirmative).

¶ 34 Mother was domiciled on the reservation at the time the petition was filed. On Father's death, C.S. either maintained or acquired Mother's domicile.[8] *See id.* Thus, we conclude that C.S. was also domiciled on the reservation. Accordingly, by accepting jurisdiction over the child custody case of an Indian child, the Fort Peck Tribal Court has exclusive jurisdiction over the proceedings.[9]

8. Although Mother and Father had joint legal custody of C.S. and Mother had physical custody, we need not decide whose domicile C.S. maintained when Mother and Father divorced. If C.S. acquired Mother's domicile when Mother and Father divorced, he maintained it when Father died. If C.S. initially maintained Father's domicile, C.S. acquired Mother's domicile when Father died.

9. We note that the action at issue in this proceeding is Mother's petition for sole custody of the child, which was filed with the Tribal Court on September 8, 1998. This action arises from Grandparents' termination of parental rights action, which was dismissed by the Tribal Court on September 9, 1998. This procedural posture may raise questions as to the applicability of ICWA, however, the circumstances do not disrupt our conclusion that ICWA applied to give the Tribal Court competent jurisdiction over the matter. We addressed a similar concern in *In re D.A.C.* when, we discussed a case, similar to the instant case, which "involved a custody dispute between a non-Indian mother and the child's Indian paternal grandparents, to whom the mother had given physical custody of her child." *In re D.A.C.* 933 P.2d at 1000. We observed that ICWA does not apply to " 'child custody disputes arising in the context of divorce or separation proceedings or similar domestic relations proceedings.' " *Id.* (quoting Guidelines for State Courts, Indian Child Custody Proceedings, 44 Fed.Reg. 67,587 (1979) (not codified)); *see also* 25 U.S.C.A. § 1903(1) (West 2001) (stating, the definition of a "child custody proceeding" does

(2) Due Process

¶ 35 Grandparents assert that enforcement of the October 16, 1998 permanent custody decree should be denied because they were denied due process when the May 22, 1998 temporary custody order was issued. The district court agreed with Grandparents and granted their motion to set aside on the ground that the October 16, 1998 permanent custody decree "maintains custody of [C.S.] under an Order which was issued without giving [Grandparents their] due process right to be heard." We review the district court's conclusion, that the October 16, 1998 permanent custody decree resulted from failure to provide due process, as a matter of law, according no deference to the district court. *See In re S.A.,* 2001 UT App 308, ¶ 14, 37 P.3d 1172; *State v. One 1980 Cadillac,* 2001 UT 26, ¶ 8, 21 P.3d 212.

¶ 36 We examine both proceedings for due process compliance.[10] First, we

"not include a placement based upon an act which, if committed by an adult, would be a crime or upon an award, in a divorce proceeding, of custody to one of the parents"). However, we concluded in *In re D.A.C.* that the "express exceptions [of 25 U.S.C.A. § 1903(1)] exclude all other exceptions." *Id.* at 1001. Further, "[t]he exception for child custody matters in a divorce is not analogous to a termination of parental rights proceeding. This case involves a proceeding in juvenile court with permanent consequences to the parent-child relationship." *Id.* Thus, we concluded that ICWA applied. *See id.* Although this case was transferred from the Juvenile Court to the Tribal Court, the consequences are the same and we see no reason to distinguish this case because of the different forum. Accordingly, we conclude that ICWA applies here as well.

10. " 'An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them the opportunity to present their objections.' " *Peralta v. Heights Med. Ctr., Inc.,* 485 U.S. 80, 84, 108 S.Ct. 896, 899, 99 L.Ed.2d 75 (1988) (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)). "So long as the parties have 'notice that a particular issue is being considered by a court' and that notice is 'given sufficiently in advance of the proceeding to per-

examine the May 22, 1998 temporary custody order. There, the juvenile court transferred Grandparents' petition to terminate Mother's parental rights to the Tribal Court for determination of whether the Tribal Court would accept jurisdiction over the case. The Tribal Court accepted jurisdiction and entered the ex parte temporary custody order on May 22, 1998. Grandparents were not given notice that the ex parte temporary custody order entered March 3, 1998, by the Juvenile Court would be addressed and might be modified in the Tribal Court hearing on May 22, 1998. Grandparents had the right to notice and an opportunity to be heard due to their status as paternal grandparents and temporary custodians under the district court's temporary custody order, thus acting in loco parentis.[11] *See* Utah Code Ann. §§ 30–5–2(1) ("Grandparents have standing to bring an action in district court requesting visitation .... "), 30–3–5(4)(a) (Supp.2000) ("In determining visitation rights of parents, grandparents, and other members of the immediate family, the court shall consider the best interest of the child."); *In re J.W.F.*, 799 P.2d 710, 715 (Utah 1990) ("Utah statutes also support the right of relatives other than parents to stand-

ing to seek custody. The legislature has allowed visitation rights for grandparents and other relatives."); *Gribble v. Gribble*, 583 P.2d 64, 66 (Utah 1978) (stating that in custody and visitation proceedings, "relationships beyond those of parent-child may be important enough to protect vis-a-vis visitation").

■ ¶ 37 However, seventeen days passed before the Tribal Court held a joint telephonic hearing to discuss the ex parte temporary custody order with the parties and the Juvenile Court on June 8, 1998. The Tribal Court stayed its temporary order in the telephonic conference until the question of the Juvenile Court's jurisdiction could be reviewed by a higher court. Nevertheless, the time between the May 22, 1998 ex parte temporary custody order and the June 8, 1998 joint telephonic conference was not "a prompt post-deprivation hearing." *Miller*, 174 F.3d at 372 n. 4. Thus, Grandparents were deprived of due process in the Tribal Court proceedings culminating in the May 22, 1998 temporary custody order.[12]

■ ¶ 38 Next, we determine whether Grandparents were denied due process in the

mit preparation,' due process is satisfied." *In re S.L.F.*, 2001 UT App 183, ¶ 10, 27 P.3d 583 (quoting *In re K.M.*, 965 P.2d 576, 579 (Utah Ct.App.1998)). "Initiating child custody proceedings by ex parte orders is generally constitutional if a prompt post-deprivation hearing is held." *Miller v. City of Philadelphia*, 174 F.3d 368, 372 n. 4 (3d Cir.1999) (concluding that a hearing within a seventy-two hour period is sufficient for due process) (citing *Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir.1994) ("Due process ... does not always require prior process.")).

11. The term "in loco parentis" means in the place of a parent, and a "person in loco parentis" is one who has assumed the status and obligations of a parent without formal adoption. Whether or not one assumes this status depends on whether that person *intends* to assume that obligation. "Where one stands in loco parentis to another, the rights and liabilities arising out of that relation are, as the words imply, exactly the same as between parent and child."
*Gribble v. Gribble*, 583 P.2d 64, 66 (Utah 1978) (citation and footnotes omitted); *see also Pope v. State*, 284 Md. 309, 396 A.2d 1054, 1062–63 (1979) (explaining common law doctrine of in loco parentis); *cf. Worley v. Jackson*, 595 So.2d 853, 855 (Miss.1992) (stating that grandparents did not stand in loco parentis because, although

they had temporary custody of the child, they did not "intend[ ] to assume toward the child the status of a parent").

12. *See Klam v. Klam*, 797 F.Supp. 202, 206 (E.D.N.Y.1992) (holding, custody decisions that "drastically affect" children should not be made ex parte); *Brown v. Jones*, 473 F.Supp. 439, 446 (N.D.Tex.1979), (stating that ex parte temporary custody orders that do not require immediate hearings with interested parties are constitutionally defective); *Sims v. State Dep't of Pub. Welfare*, 438 F.Supp. 1179, 1193 (S.D.Tex.1977), *rev'd on other grounds sub. nom. Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) (stating, "the State's interest in the protection of the alleged victims of abuse and the resulting usurpation of parental rights does not justify holding this ex parte presentation to a judicial authority beyond the very day of seizure"); *Miller v. Superior Court of Los Angeles County*, 22 Cal.3d 923, 151 Cal.Rptr. 6, 587 P.2d 723, 735 (1978) (stating, "when the facts alleged are insufficient to show that such an emergency existed, characterizing the order as temporary in nature, subject to challenge on the return date, does not cure the due process defect of the ex parte order"); *cf. Miller v. City of Philadelphia*, 174 F.3d 368, 372 n. 4 (3d Cir.1999) (stating, an ex parte custody order is constitutional when hearing held within seventy-two hours).

proceedings culminating in the October 16, 1998 permanent custody decree. As we stated previously, "[s]o long as the parties have 'notice that a particular issue is being considered by a court' and that notice is 'given sufficiently in advance of the proceeding to permit preparation,' due process is satisfied." *In re S.L.F.*, 2001 UT App 183,¶ 10, 27 P.3d 583 (quoting *In re K.M.*, 965 P.2d 576, 579 (Utah Ct.App.1998)). The Tribal Court mailed notice to Grandparents, and they acknowledged receipt of the notice in a prior stage of this litigation. Grandparents were given " 'notice that [the custody] issue [was] being considered by' " the Tribal Court, and the notice was " 'given sufficiently in advance of the proceeding to permit preparation.' " *Id.* Unfortunately for Grandparents, they decided not to submit pleadings, to contact the Tribal Court, or to participate in the proceedings in any manner. Grandparents' decision not to participate in the Tribal Court's proceedings is not a deprivation of due process. Accordingly, "due process is satisfied" regarding the October 16, 1998 hearing. *Id.*

¶ 39 We conclude that there was a failure of due process in the May 22, 1998 temporary custody proceeding, but that due process was satisfied in the October 16, 1998 permanent custody proceeding. The District Court's decision that due process was not provided to Grandparents in the October 16, 1998 permanent custody hearing because of the court's prior ruling on due process in the May 22, 1998 temporary custody hearing, was "[a] decision premised on a flawed legal conclusion[ ]" and thus "constitutes an abuse of discretion." *Lund v. Brown*, 2000 UT 75,¶ 9, 11 P.3d 277. Accordingly, we reverse the district court's order setting aside the August 25, 1999 Entry of Judgment recognizing the October 16, 1999 Tribal Court permanent custody decree.

## CONCLUSION

¶ 40 Initially, we conclude that any decision which could be reached in Mother's first appeal would be rendered moot by our disposition of Mother's second appeal. Thus, we dismiss Mother's first appeal. Next, we conclude that Mother adequately preserved the issues for, and that res judicata does not

preclude, Mother's second appeal. Finally, we conclude that the District Court abused its discretion by granting Grandparents' Rule 60(b) motion to set aside recognition of the foreign judgment. The judgment was properly registered according to the requirements of the Foreign Judgment Act, and was both final and valid.

¶ 41 Although our disposition of Mother's appeals results in her full custody of C.S., our task has not been to decide custody, but only to decide whether to recognize a judgment rendered by a foreign judicial system. *See Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 53, 109 S.Ct. 1597, 1611, 104 L.Ed.2d 29 (1989). We are sensitive to the fact that our conclusion may "disrupt ... strong emotional bonds which [may] have developed between" C.S. and his Grandparents since the death of Father; however, we are mandated to reach this result by a "legal system [that] is ill-equipped to deal with these very real problems." *In re Adoption of Halloway*, 732 P.2d 962, 971 (Utah 1986); *see also Holyfield*, 490 U.S. at 53, 109 S.Ct. at 1611.

¶ 42 We vacate the District Court's Order Setting Aside Judgment and confirm the immediate enforceability of the August 25, 1999 Entry of Judgment.

¶ 43 I CONCUR: JUDITH M. BILLINGS, Judge.

BENCH, Judge (concurring in the result):

¶ 44 This case is not nearly as complex as it may appear. In appeal number 990726, Judge Timothy Hanson denied a Petition for Writ of Assistance wherein appellant (Mother) sought to enforce the Tribal Court's temporary custody order. Judge Hanson denied this Petition because the Tribal Court had granted temporary custody to Mother in an ex parte order, without any notice to appellees (Grandparents).

¶ 45 In appeal number 20000274, Judge Leslie Lewis properly granted full faith and credit to the Tribal Court's order of permanent custody. Grandparents received notice of that proceeding in Tribal Court and chose

not to appear. Judge Lewis erred, therefore, when she granted Grandparents' Rule 60(b) motion on the basis that Judge Hanson's ruling on temporary custody was controlling.

¶ 46 I therefore concur in the result of the main opinion, holding that Judge Lewis's original judgment of August 25, 1999 is valid and enforceable.